## KEPNER v. UNITED STATES.

ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 244. Argued April 22, 1904.—Decided May 31, 1904.

The expressed declarations of the President in Military Order, No. 58, of April 23, 1900, and in the act of July 1, 1902, establishing a civil government in the Philippine Islands, both adopting with little alteration the provisions of the Bill of Rights, show that it was intended to carry to the Philippine Islands those principles of our Government which the President declared to be established as rules of law for the maintenance of individual freedom; and those expressions were used in the sense which has been placed upon them in construing the instrument from which they were taken.

It is a well settled rule of construction that language used in a statute which has a settled and well known meaning, sanctioned by judicial decision, is presumed to be used in that sense by the legislative body.

It is a well settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling.

Although a right of appeal was given to the Government by Military Order, No. 58, in criminal cases in the Philippine Islands, § 5 of the act of July 1, 1902, establishing a civil government in the Islands, specifically provided that no person should be put twice in jeopardy for the same offense, thereby repealing the provision in the military order and nothing in § 9 of the act of 1902 can be construed as intending to prevail over the specific guaranty contained in § 5.

In ascertaining the meaning of a phrase in the Constitution taken from the Bill of Rights, it must be construed with reference to the common law from which it was taken.

At common law protection from second jeopardy for the same offense clearly included immunity from second prosecution where the court having jurisdiction had acquitted the accused of the offense; and it is the settled law of this court that former jeopardy includes one who has been acquitted by a verdict duly rendered, although no judgment be entered on the verdict, and it was found upon a defective indictment. The second jeopardy is not against the peril of second judgment, but against being again tried for the same offense.

THE facts, which involved the application of the constitutional immunity provision of the Constitution of the United States to the Philippine Islands, are stated in the opinion of the court.

*Mr. Charles H. Aldrich* for plaintiff in error:[1]

The result of *De Lima* v. *Bidwell* and the *Fourteen Diamond Rings Case* made these islands territory of the United States. They ceased to be foreign in any sense. Hence tariff laws were not applicable until Congress had made them so.

That the term "United States" in the Uniformity Clause had a restricted meaning and that these possessions were not within that clause of the Constitution, was the judgment of a majority of this court.

The status of the Philippine Archipelago is fixed as territory of the United States. *Fourteen Diamond Rings Case,* 183 U. S. 176, 179.

The question whether any particular provision is applicable depends upon whether Congress has extended that provision to such territory.

Considered in connection with the *Hawaiian* case, even the application of the bill of rights, so called, becomes a question of relation.

If we assume that enough has been done in the Philippines to incorporate them into the United States as required by one section of this court, or to extend the Constitution thereto as demanded by another view here expressed, then clearly the plaintiff in error must succeed.

[1] *Dorr* v. *United States,* No. 584, *post,* 138, and *Mendezona* v. *United States,* No. 583, *post,* 158, were argued simultaneously with this case.

Again, if every agency of the Government is bound by these limitations upon the powers of Congress upon the establishment of civil government in the Philippines in dealing with persons not in the military service of the United States, the plaintiff in error must be sustained. See *Hawaii* v. *Mankichi*, 190 U. S. 197, 217; White, J., in same, p. 221; Harlan, J., in same, p. 237; *Downes* v. *Bidwell*, White, J., concurring opinion, 182 U. S. 244, 288, citing McLean, J., in *Dred Scott* v. *Sanford*, 19 How. 393, 542; Curtis, J., in same, p. 614.

The Territory being territory of the United States can only be governed by agencies of the United States, and as these agents are limited in their powers by the Constitution, it follows that without action by Congress, that is, in the absence of any action by Congress, unconstitutional acts may not be lawfully done in the Philippines.

It has been repeatedly stated by this court that while municipal law in force under the former sovereign remained in force as governing private persons and property, until changed by Congress, those laws which were in conflict with our Constitution and the spirit of our institutions were by the fact of acquisition abrogated. *Dred Scott* v. *Sanford*, 19 How. 398, 450; *Fong Yue Ting* v. *United States*, 149 U. S. 716, 738; *Pollard* v. *Hagan*, 3 How. 212, 225; *Leitensdorfer* v. *Webb*, 20 How. 176; *Murphy* v. *Ramsey*, 114 U. S. 15, 44; *Chicago, R. I. & P.* v. *McGlinn*, 114 U. S. 542, 546; *Downes* v. *Bidwell*, White, J., 182 U. S. 244, 291.

Why appeal to the spirit of our institutions, when we have the spirit embodied in these amendments constituting a bill of rights, a *Magna Charta*, as they were frequently called in the debates upon the adoption of the Constitution?

Such a course is to make uncertain the liberties of the people. They rest not in the letter of the Constitution, but in judicial interpretation, and the recent cases show that the members of our highest courts are unable to agree as to what they are or when they are available to the protection of the people.

Why make a difference between these prohibitions upon the

power of Congress by stating that some protect natural rights and some only methods of procedure?

They are all in the Constitution of equal dignity, if we look to that instrument alone. See *Reynolds* v. *United States*, 98 U. S. 145, 154, 162; *Callan* v. *Wilson*, 127 U. S. 540, 549; *Springville* v. *Thomas*, 166 U. S. 707; *Publishing Co.* v. *Fisher*, 166 U. S. 464; *Bauman* v. *Ross*, 167 U. S. 548; *Thompson* v. *Utah*, 170 U. S. 343; *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 5, 45; *Black* v. *Jackson*, 177 U. S. 349, 363.

The cases relating to the Territories and those relating to the District of Columbia are treated by this court as resting upon the same principle. It is evident that this is so, there being no distinction to be drawn between the power to make rules and regulations respecting the territory of the United States, and the power to exercise exclusive legislation, in all cases whatsoever, in the District; none, at least, which would tend to give less effect to the constitutional prohibitions in the former case than in the latter. The decisions in all these cases have been unanimous on the point to which we cite them. Every member of the bench, as it is now constituted, has participated in one or more of them, and the same is true, with, we believe, a single exception, of every one of its distinguished occupants since 1878.

See also *Wong Wing* v. *United States*, 163 U. S. 228, citing on p. 238, *Yick Wo* v. *Hopkins*, 118 U. S. 300, to effect that the provisions of the Fourteenth Amendment to secure life, liberty and property, "are universal in their application to all persons within the territorial jurisdiction." And see *Webster* v. *Reid*, 11 How. 437, 460.

And see the question again considered in *Dred Scott* v. *Sanford*, 19 How. 393, as to the validity of the Missouri Compromise Act, which prohibited slavery in that part of the Louisiana Purchase lying north of 36°, 30', north latitude and not included in the limits of the State of Missouri.

See especially dissenting opinions of McLean, J., and Curtis, J., as to when does territory become so far incorporated,

to use the language of the concurring opinion in the *Hawaiian* case, as to make these provisions of the Constitution applicable. It was conceded by all that the act of April 30, 1900, was effectual for that purpose.

Tried by this test, the acts of the President, of the Commission, and of Congress of July 1, 1902, prevented double jeopardy and tried by any of the tests proposed by any of the variant opinions in the cases cited, the contention of the plaintiff in error must be sustained.

And see also the Spooner Resolution of March 2, 1901, which constituted full authority to the President to extend the Constitution, and perhaps such portions of it as he might deem advisable, to the Philippine Islands; and, as we have seen, he did extend the provision forbidding that a person should be twice put in jeopardy for the same offense. The conclusion follows that when the Congress has given a broad letter of attorney to the President, making him the judge of what is necessary to govern the Philippines, and he extends the Constitution in whole or in part, it is the act of his principal.

All of the acts relating to criminal trial were prior to the commission of the offense for which the plaintiff in error was submitted to a double jeopardy, except the act of Congress and that act was prior to his second trial.

Have not all these provisions extended this prohibition of the Constitution to the Philippine Islands? If they have not, what would be effective for that purpose?

The court will note that the right of appeal by the United States is predicated wholly upon General Orders No. 58, issued by the military commander under date April 23, 1900. It is submitted that this cannot override an order of the President taking effect at a later date and looking to the restoration of the ordinary civil and criminal jurisdiction of the courts of this country, and that the language used by the President and Congress must be held to have been used with its accepted meaning in this country. It seems certain, that as against the liberty of the citizen, this court is not authorized

to deny to the language thus used by the executive and legislative branches of the Government its ordinary acceptation.

Two trials in a criminal case are not consistent with the prohibition against double jeopardy in the Federal Constitution. *United States* v. *Sanges,* 144 U. S. 310; *Sparf* v. *United States,* 156 U. S. 51, 87, 175; *United States* v. *Ball,* 163 U. S. 662, 669, 671; *Ex parte Lange,* 18 Wall. 163; *Berkowitz* v. *United States,* 93 Fed. Rep. 452, and other cases cited by the Government, distinguished. And see also *In re Belt,* 159 U. S. 95, 98; *Ex parte Mason,* 105 U. S. 696, 699; *Murphy* v. *Massachusetts,* 177 U. S. 155; *Kohlheimer* v. *State,* 39 Mississippi, 548; *State* v. *Ward,* 48 Arkansas, 36; *Black* v. *State,* 36 Georgia, 447; *Hilands* v. *Commonwealth,* 111 Pa. St. 1; *State* v. *McKee,* 1 Bailey Law, 651; *S. C.,* 21 Am. Dec. 499, with notes; *Commonwealth* v. *Fitzpatrick,* 121 Pa. St. 109; *McDonald* v. *State,* 79 Wisconsin, 651; *O'Brian* v. *Commonwealth,* 9 Bush, 333; *Durham* v. *State,* 4 Scam. 172; *People* v. *Miner,* 144 Illinois, 308.

These cases show that while there is not a unanimity of decision as to the precise moment when jeopardy attaches, there is substantial unanimity that where the indictment or information is sufficient, and the defendant is acquitted in a court having jurisdiction, he cannot be called upon to again answer for the same offense.

*Mr. Lebbeus R. Wilfley,* Attorney General for the Philippine Islands, for the United States in this case and in Nos. 583 and 584.

Plaintiff in error, a member of the Manila bar, was tried by the court of first instance of the city of Manila in November, 1901, on the charge of *estafa* (embezzlement of the funds of a client) and acquitted.

Under the law now in force in the Philippine Islands, which gives the Government as well as the accused the right of appeal from final judgments of the courts of first instance in criminal cases, the Government appealed the case and the

Supreme Court reversed the judgment of the lower court, sentencing the plaintiff in error to one year, eight months and twenty-one days' imprisonment, together with suspension from the office of attorney at law.

The plaintiff in error contends that the right to trial by jury is in the Philippine Islands. The court has held in the *Insular* cases and in the case of *Hawaii* v. *Mankichi* that the Constitution does not of its own force attach to newly acquired territory immediately upon the date of acquisition; that power to extend the provisions of the Constitution to the Territories rests in Congress; that notwithstanding the fact that there are certain prohibitions contained in the Constitution relating to fundamental rights which go to the very root of the power of Congress to act, at all times, in all places, and under all circumstances, yet there are other limitations contained in that instrument, not absolute in their nature, relating to such matters as methods of procedure and forms of judicial trials, which do not restrict Congress in the exercise of its power to create local governments and make needful rules and regulations for the Territories of the United States.

The power of Congress to provide such modes of trial and methods of procedure as in its judgment are best adapted to the needs of the people of the Territory is clearly recognized in the foregoing cases.

The sole question raised in this case, in our opinion, is whether the provision of the Code of Criminal Procedure now in force in the Philippine Islands, which gives the Government, as well as the accused, the right of appeal from judgments of the trial court in criminal cases, is repealed by the act of Congress of July 1, 1902, entitled "An act temporarily to provide for the administration of the affairs of civil government in the Philippine Islands, and for other purposes," which provides that no person "for the same offence shall be twice put in jeopardy of punishment."

General Order No. 58 is not repealed by said act of Congress because the clause giving the Government the right of

trial in government cases does not violate the provision against double jeopardy contained in said act. The principle of law against double jeopardy exists in the Spanish as it does in the common law countries. The proceeding before the court of the first instance and the Supreme Court of the Philippine Islands are but parts of a single continuous trial. Congress in enacting this piece of special legislation, must be supposed to have had in view the conditions and circumstances existing in the Philippine Islands and the laws in force there on the subject of criminal procedure, and to have legislated with special reference thereto.

The system of trial by jury has been withheld from the Philippines by Congress.

Hence Congress cannot be presumed, by the use of general terms, to have engrafted on the Roman law system of trial by judges an application of the treaty against double jeopardy which is connected inseparably with the common law system of trial by jury. This could only be done by express, specific provision repealing unmistakably the law of procedure in force in the islands at the date of the passage of the act.

The adoption by Congress of the Spanish law application of the principle against double jeopardy is not in derogation of any fundamental right guaranteed by the Constitution of the United States, does not violate any principle of natural justice, and is not inconsistent with the universal principle of jurisprudence which enforces the conclusiveness of a final and valid judgment.

All rules of statutory construction support the interpretation herein contended for.

*Mr. Solicitor General Hoyt* for the United States in this case and in Nos. 583 and 584:

The first question here is whether the express limitations respecting trial by jury apply of their own force in the Philippines as a vital and inherent principle of our free government everywhere, or whether they constitute simply a remedial

right and a particular method of procedure . peculiar to our Anglo-Saxon jurisprudence, but not essential to the protection of individual liberty.

This question was answered in the *Mankichi Case*, 190 U. S. 197. From that decision it seems clear that while most of the privileges and immunities of the bill of rights apply to Territories from the moment of acquisition, trial by jury does not. That institution is not a necessary and fundamental right, but concerns procedure mainly, and the guarantee does not apply to newly acquired territory. Trial by jury was entirely unknown to the civil law in general and as administered in the Philippines, and the civil law method of trial has always been in vogue there, is familiar to the people and is perfectly adequate to all the demands of justice.

The respect which we are bound to feel for the institutions of the civil law, and the idea that the rights of new people coming under our sovereignty should not be unnecessarily interfered with in respect to their historical institutions and jurisprudence, have been expressed by the court in opinions of great ability and force. *Hurtado* v. *California*, 110 U. S. 516; *Holden* v. *Hardy*, 169 U. S. 366.

Previous cases involving the question as to the right of trial by jury establish these propositions: that the first eight amendments to the Constitution do not operate upon the States; that accordingly, while jury trial is a necessary rule in courts of the United States, including the District of Columbia and the organized Territories, nevertheless the State may provide for other modes of accusation and trial consistently with due process of law and the principles of free government. *Webster* v. *Reid*, 11 How. 437; *Hurtado* v. *California*, 110 U. S. 516; *In re Ross*, 140 U. S. 473; *American Pub. Co.* v. *Fisher*, 166 U. S. 46; *Thompson* v. *Utah*, 170 U. S. 343; *Bolln* v. *Nebraska*, 176 U. S. 83; *Maxwell* v. *Dow*, 176 U. S. 584; *Downes* v. *Bidwell*, 182 U. S. 244. The *Mankichi* case and the present cases add to this rule Territories not organized.

The power of Congress here is plenary. Congress has exer-

cised it by maintaining all the guarantees vital and necessary to free government which our war power had imposed upon itself at the outset. Congress has not only not extended the Constitution and laws in general of the United States, but has affirmatively withheld them, and intentionally has not included trial by jury in the bill of rights conferred. Under these circumstances, and under the decisions as interpreted and applied by the *Insular* cases, the logic is certain and inevitable that the right of trial by jury does not apply to the Philippine Islands.

What does the provision as to jeopardy in the Philippine civil government act mean as applied to Philippine conditions? What was the intention of Congress? The principle is ancient and inherent in all just laws, and in some sense is a fundamental limitation on our Government everywhere. It is evident, however, that the scope and effect of our rules are essentially dependent upon the peculiar function and conclusive authority of a jury. The finality of a verdict against the prosecution rules the whole subject.

Under the system we found in the Philippines all serious crimes were necessarily reviewed by the audiencia, whether acquittal or conviction resulted below, and the case was not final, the trial ended and the jeopardy complete until the audiencia had pronounced judgment. The American legislation has made no substantial changes in these proceedings. Under the present system there is not more than one trial; the original trial is a unitary and continuous thing and is not complete until the appellate court has pronounced judgment.

Congress has manifested a clear intention to approve and sustain the established scheme as modified and enlarged under our authority; the Philippine situation was studied with particular care and great deliberation, and Congress acted upon full information. It is incredible that Congress meant to impose the peculiar conception and effect of the rule on jeopardy which is imbedded in our law simply because of its relation to trial by jury. If that view were sustained, such

mischiefs and confusion would follow as those which would be consequent upon the immediate introduction of grand and petit juries. It was never intended, by the insertion of the jeopardy clause to wipe out by mere remote implication the entire established course of state appeals in criminal cases. If Congress had desired to give to our Government in the Philippines the authority to strike down appeals by the prosecution in criminal cases, they would have done so in clear and unmistakable language.

There is due process of law in the Philippines within our own fundamental guarantees and by our own tests. The system is sufficient for the full demands of distributive justice. The law is equal and operates upon all alike. It is as right for this Government to preserve the essential character of the structure as a possession and cherished institution of the inhabitants, as it is for a State to adopt just such institutions upon the desires and demands of its people. See *Missouri* v. *Lewis*, 101 U. S. 22, 31.

The Philippine laws respecting criminal trials and appeals are entirely harmonious with the necessary principles of free government, and all the proceedings taken herein were due and legal and were not forbidden by the Constitution and laws of the United States.

MR. JUSTICE DAY delivered the opinion of the court.

Thomas E. Kepner, a practicing lawyer in the city of Manila, Philippine Islands, was charged with a violation of the law in the embezzlement of the funds of his client (*estafa*). Upon trial, in November, 1901, in the court of first instance, without a jury, he was acquitted, it being the judgment of the court that he was not guilty of the offense charged. Upon appellate proceedings by the United States to the Supreme Court of the Philippine Islands the judgment of the court of first instance, finding the accused not guilty, was reversed, and Kepner was found guilty and sentenced to a term of imprisonment of one

year, eight months and twenty-one days, suspended from any public office or place of trust and deprived of the right of suffrage.

Error was assigned in the appellate court upon the ground that the accused had been put in jeopardy a second time by the appellate proceedings, in violation of the law against putting a person twice in jeopardy for the same offense, and contrary to the Constitution of the United States.

The appeal was taken by the United States on December 20, 1901. A motion to dismiss the appeal was made on January 1, 1902. The motion was finally overruled on October 11, 1902; the final decision in the case, finding the accused guilty and imposing the sentence, was rendered on December 3, 1902.

A proper consideration of the question herein made renders it necessary to notice some of the steps by which the jurisdiction of the courts in which the accused was tried was established.

The United States acquired the Philippine Islands by cession under the treaty of peace executed at Paris, between the United States and Spain, on December 10, 1898, the final ratifications being exchanged April 11, 1899.

The islands after American occupation had been under military rule prior to the creation of the Philippine Commission.

Under the control of the military government, orders had been issued, among others, military order number 58, dated April 23, 1900, which order was in part as follows:

"General Orders, No. 58.
"Manila, P. I., April 23, 1900.
"In the interests of justice and to safeguard the civil liberties of the inhabitants of these islands, the criminal code of procedure now in force therein is hereby amended in certain of its important provisions as indicated in the following enumerated sections:

\*     \*     \*     \*     \*     \*     \*     \*

"Sec. 3. All public offences triable in courts of first instance on in courts of similar jurisdiction, now established or that hereafter may be established, must be prosecuted by complaint or information.

\*    \*    \*    \*    \*    \*    \*    \*

*Rights of accused at the trial.*

"Sec. 15. In all criminal prosecutions the defendant shall be entitled:

"1. To appear and defend in person and by counsel at every stage of the proceedings.

"2. To be informed of the nature and cause of the accusation.

"3. To testify as a witness in his own behalf; but if a defendant offers himself as a witness he may be cross-examined as any other witness. His neglect or refusal to be a witness shall not in any manner prejudice or be used against him.

"4. To be exempt from testifying against himself.

"5. To be confronted at the trial by and to cross-examine the witnesses against him. Where the testimony of a witness for the prosecution has previously been taken down by question and answers in the presence of the accused or his counsel, the defence having had an opportunity to cross-examine the witness, the deposition of the latter may be read, upon satisfactory proof to the court that he is dead or insane, or cannot with due diligence be found in the islands.

"6. To have compulsory process issue for obtaining witnesses in his own favor.

"7. To have a speedy and public trial.

"8. To have the right of appeal in all cases.

\*    \*    \*    \*    \*    \*    \*    \*

"Sec. 43. From all final judgments of the courts of first instance or courts of similar jurisdiction, and in all cases in which the law now provides for appeals from said courts an appeal may be taken to the Supreme Court as hereinafter prescribed. . . .

"Sec. 44. Either party may appeal from a final judgment

or from an order made after judgment affecting the substantial rights of the appellant or in any case now permitted by law. The United States may also appeal from a judgment for the defendant rendered on a demurrer to an information or complaint, and from an order dismissing a complaint or information.

\*   \*   \*   \*   \*   \*   \*   \*·

"Sec. 50. It shall not be necessary to forward to the Supreme Court the record, or any part thereof, of any case in which there shall have been an acquittal, or in which the sentence imposed does not exceed confinement in prison for one year, or a fine of 250 pesos, exclusive of costs, unless such case shall have been duly appealed. But such sentences shall be executed upon the order of the court in which the trial was had. The record in cases in which the death penalty, or imprisonment exceeding one year, or a fine exceeding 250 pesos, exclusive of costs of trial, shall have been imposed, shall be forwarded to the clerk of the criminal branch of the Supreme Court within twenty days, but not earlier than fifteen days after the rendition of the sentence. All cases involving sentence of death, or of imprisonment exceeding six years, or of fine exceeding 1250 pesos, or in which an appeal shall have been taken, shall be submitted to the criminal branch of the Supreme Court, and shall thereafter take the same course as is now provided by law. Cases forwarded to the Supreme Court involving sentences less serious than those hereinbefore last mentioned, and not appealed, shall be referred by the clerk to the ministerio fiscal for consideration, and if the latter return the same concurring in the sentence imposed, the record shall immediately be returned to the trial court for execution of sentence. If the ministerio fiscal shall not concur in the sentence the case shall be submitted to the criminal branch of the Supreme Court, and shall thereafter take the same course as is now provided by law when that officer shall recommend a sentence in any respect more severe than that imposed by the trial judge, and for the consideration of the

court, without the necessity of a further defence or hearing, when that officer recommends a lighter sentence."

This order was amended by an act of the commission (No. 194), passed August 10, 1901, and is as follows:

"(G) No. 194. An act conferring jurisdiction on justices of the peace, &c.

"Sec. 1. Every justice of the peace in the Philippine Islands is hereby invested with authority to make preliminary investigation of any crime alleged to have been committed within his municipality, jurisdiction to hear and determine which is by law now vested in the judges of courts of first instance. . . .

"Sec. 4. So much of section fifty of said general order number fifty-eight as requires courts of first instance, or clerks thereof, to forward to the Supreme Court or the ministerio fiscal the record of all criminal cases for revision or consideration, except where the death penalty is imposed as the judgment or part of the judgment of such court of first instance, is hereby repealed, and it shall not be necessary to forward to the Supreme Court or the ministerio fiscal the record, or any part thereof, of any case in which there shall have been an acquittal, or in which the penalty imposed is not death, unless such case shall have been duly appealed, as provided in such order. The records of all cases in which the death penalty shall have been imposed by any court of first instance, whether the defendant shall have appealed or not, shall be forwarded to the Supreme Court for investigation and judgment, as law and justice shall dictate."

Courts were established for the islands under an act passed by the commission June 11, 1901:

"Sec. 2. The judicial power of the government of the Philippine Islands shall be vested in a Supreme Court, courts of first instance, and courts of justices of the peace, together with such special jurisdictions of municipal courts, and other special tribunals as now are or hereafter may be authorized by law. The two courts first named shall be courts of record.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Sec. 16. The jurisdiction of the Supreme Court shall be of two kinds:

"1. Original; and

"2. Appellate.

"Sec. 17. The Supreme Court shall have original jurisdiction to issue writs of mandamus, certiorari, prohibition, *habeas corpus* and *quo warranto* in the cases and in the manner prescribed in the Code of Civil Procedure, and to hear and determine the controversies thus brought before it, and in other cases provided by law.

"Sec. 18. The Supreme Court shall have appellate jurisdiction of all actions and special proceedings properly brought to it from courts of first instance, and from other tribunals from whose judgment the law shall specially provide an appeal to the Supreme Court.

"Sec. 19. The Supreme Court shall have power to issue writs of certiorari and all other auxiliary writs and process necessary to the complete exercise of its original or appellate jurisdiction.

\* \* \* \* \* \* \* \*

"Sec. 39. The existing audiencia or Supreme Court is hereby abolished, and the Supreme Court provided by this act is substituted in place thereof.

\* \* \* \* \* \* \* \*

"Sec. 55. The jurisdiction of courts of first instance shall be of two kinds:

"1. Original; and

"2. Appellate.

"Sec. 56. Courts of first instance shall have original jurisdiction. . . . 6. In all criminal cases in which a penalty of more than six months' imprisonment or a fine exceeding one hundred dollars may be imposed.

\* \* \* \* \* \* \* \*

"Sec. 65. The existing courts of first instance are hereby abolished, and the courts of first instance provided by this act are substituted in place thereof.

"Sec. 66. There shall be courts of justice of the peace as in this section provided:

"1. The existing courts of justices of the peace, established by military orders since the thirteenth day of August, eighteen hundred and ninety-eight, are hereby recognized and continued, and the justices of such courts shall continue to hold office during the pleasure of the commission.

"2. In every province in which there now is, or shall hereafter be established, a court of first instance, courts of justice of the peace shall be established in every municipality thereof which shall be organized under the municipal code, or which has been organized and is being conducted as a municipality when this act shall take effect, under and by virtue of the municipal code.

* * * * * * * *

"Sec. 68. A justice of the peace shall have original jurisdiction for the trial of all misdemeanors and offences arising within the municipality of which he is a justice, in all cases where the sentence might not by law exceed six months' imprisonment or a fine of one hundred dollars; . . ."

On July 1, 1902, Congress passed an act, 32 Stat. 691:

"An Act temporarily to provide for the administration of the affairs of civil government in the Philippine Islands, and for other purposes.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the action of the President of the United States in creating the Philippine Commission and authorizing said commission to exercise the powers of government to the extent and in the manner and form and subject to the regulation and control set forth in the instructions of the President to the Philippine Commission, dated April seventh, nineteen hundred, and in creating the offices of civil governor and vice-governor of the Philippine Islands, and authorizing said civil governor and vice-governor to exercise the powers of government to the extent and in the manner and form set forth in the executive

order dated June twenty-first, nineteen hundred and one, and in establishing four executive departments of government in said islands as set forth in the act of the Philippine Commission, entitled 'An act providing an organization for the departments of the interior, of commerce and police, of finance and justice, and of public instruction,' enacted September sixth, nineteen hundred and one, is hereby approved, ratified, and confirmed, and until otherwise provided by law the said islands shall continue to be governed as thereby and herein provided, and all laws passed hereafter by the Philippine Commission shall have an enacting clause as follows: 'By authority of the United States be it enacted by the Philippine Commission.' The provisions of section eighteen hundred and ninety-one of the Revised Statutes of eighteen hundred and seventy-eight shall not apply to the Philippine Islands.

"Future appointments of civil governor, vice-governor, members of said commission, and heads of executive departments shall be made by the President, by and with the advice and consent of the Senate.

*       *       *       *       *       *       *       *

"Sec. 5. That no law shall be enacted in said islands which shall deprive any person of life, liberty or property without due process of law, or deny to any person therein the equal protection of the laws.

"That in all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel, to demand the nature and cause of the accusation against him, to have a speedy and public trial, to meet the witnesses face to face, and to have compulsory process to compel the attendance of witnesses in his behalf.

"That no person shall be held to answer for a criminal offence without due process of law; and no person for the same offence shall be twice put in jeopardy of punishment, nor shall be compelled in any criminal case to be a witness against himself.

"That all persons shall before conviction be bailable by sufficient sureties, except for capital offences.

"That no law impairing the obligation of contracts shall be enacted.

"That no person shall be imprisoned for debt.

"That the privilege of the writ of *habeas corpus* shall not be suspended, unless when in cases of rebellion, insurrection or invasion the public safety may require it, in either of which events the same may be suspended by the President, or by the governor, with the approval of the Philippine Commission, whenever during such period the necessity for such suspension shall exist.

"That no *ex post facto* law or bill of attainder shall be enacted.

"That no law granting a title of nobility shall be enacted, and no person holding any office of profit or trust in said islands shall, without the consent of the Congress of the United States, accept any present, emolument, office or title of any kind whatever from any king, queen, prince or foreign State.

"That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.

"That the right to be secure against unreasonable searches and seizures shall not be violated.

"That neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist in said islands.

"That no law shall be passed abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and petition the Government for redress of grievances.

"That no law shall be made respecting an establishment of religion or prohibiting the free exercise thereof, and that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed.

"That no money shall be paid out of the treasury except in pursuance of an appropriation by law.

"That the rule of taxation in said islands shall be uniform.

"That no private or local bill which may be enacted into law shall embrace more than one subject, and that subject shall be expressed in the title of the bill.

"That no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

"That all money collected on any tax levied or assessed for a special purpose shall be treated as a special fund in the treasury and paid out for such purpose only.

\* \* \* \* \* \* \* \*

"SEC. 9. That the Supreme Court and the courts of first instance of the Philippine Islands shall possess and exercise jurisdiction as heretofore provided, and such additional jurisdiction as shall hereafter be prescribed by the government of said islands, subject to the power of said Government to change the practice and method of procedure. The municipal courts of said islands shall possess and exercise jurisdiction as heretofore provided by the Philippine Commission, subject in all matters to such alteration and amendment as may be hereafter enacted by law; and the chief justice and associate justices of the Supreme Court shall hereafter be appointed by the President, by and with the advice and consent of the Senate, and shall receive the compensation heretofore prescribed by the commission until otherwise provided by Congress. The judges of the court of first instance shall be appointed by the civil governor, by and with the advice and consent of the Philippine Commission: *Provided,* That the admiralty jurisdiction of the Supreme Court and courts of first instance shall not be changed except by act of Congress.

"SEC. 10. That the Supreme Court of the United States shall have jurisdiction to review, revise, reverse, modify or affirm the final judgments and decrees of the Supreme Court of the Philippine Islands in all actions, cases, causes and proceedings now pending therein or hereafter determined thereby in which the Constitution or any statute, treaty, title, right or privilege of the United States is involved, or in causes in

which the value in controversy exceeds twenty-five thousand
dollars, or in which the title or possession of real estate ex-
ceeding in value the sum of twenty-five thousand dollars, to
be ascertained by the oath of either party or of other compe-
tent witnesses, is involved or brought in question; and such
final judgments or decrees may and can be reviewed, revised,
reversed, modified or affirmed by said Supreme Court of the
United States on appeal or writ of error by the party ag-
grieved, in the same manner, under the same regulations, and
by the same procedure, as far as applicable, as the final judg-
ments and decrees of the Circuit Courts of the United States."

The act just quoted became a law before the final conviction
of the accused in the Supreme Court of the islands.

It is contended by the Government that that part of the
law under immediate consideration, which provides that no
person, for the same offense, shall be twice put in jeopardy,
must be construed in view of the system of laws prevailing
in the islands before the same were ceded to the United States,
and that the purpose of Congress was to make effectual the
jurisprudence of the islands as known and established before
American occupation, and that, the provision against double
jeopardy must be read in the light of the understanding of
that expression in the civil law, or rather the Spanish law as
it was then in force.

The citations in the brief of the learned counsel for the
Government seem to establish that under the Spanish law,
as theretofore administered, one who had been convicted by
a judgment of the court of last resort could not again be prose-
cuted for the same offense. We notice some of these provi-
sions:

In Spanish law the doctrine found expression in the Fuero
Real (A. D. 1255) and the Siete Partidas (A. D. 1263).

"After a man, accused of any crime, has been acquitted
by the court, no one can afterwards accuse him of the same
offence (except in certain specified cases). Fuero Real, lib. iv,
tit. xxi, 1, 13.

"If a man is acquitted by a valid judgment of any offence of which he has been accused, no other person can afterwards accuse him of the offence (except in certain cases). Siete Partidas, Part VII, tit. i, l. xii."

In the encyclopedia of Spanish law, published by Don Lorenzo Arrazola in 1848, it is said, in considering the persons who may be accused of crime:

"It is another of the general exceptions that a person cannot be accused who has formerly been accused and adjudged of the same crime, since the most essential effect of all judicial decisions upon which execution can issue is to constitute unalterable law. Tomo I, pag. 511."

Under that system of law it seems that a person was not regarded as being in jeopardy in the legal sense until there had been a final judgment in the court of last resort. The lower courts were deemed examining courts, having preliminary jurisdiction, and the accused was not finally convicted or acquitted until the case had been passed upon in the audiencia, or Supreme Court, whose judgment was subject to review in the Supreme Court at Madrid for errors of law, with power to grant a new trial. The trial was regarded as one continuous proceeding, and the protection given was against a second conviction after this final trial had been concluded in due form of law. The change introduced under military order No. 58, as amended by act 194 of the commission, made the judgment of the court of first instance final, in cases other than capital, whether the accused be convicted or acquitted, unless an appeal was prosecuted by the Government or the accused in the manner pointed out.

In order to determine what Congress meant in the language used in the act under consideration, "No person for the same offence shall be twice put in jeopardy of punishment," we must look to the origin and source of the expression and the judicial construction put upon it before the enactment in question was passed. A consideration of the events preceding this regulation makes evident the intention of Congress to

carry some at least of the essential principles of American constitutional jurisprudence to these islands and to engraft them upon the law of this people, newly subject to our jurisdiction.

That it was the intention of the President in the instructions to the Philippine Commission to adopt a well-known part of the fundamental law of the United States, and to give much of the beneficent protection of the bill of rights to the people of the Philippine Islands, is not left to inference, for in his instructions, dated April 7, 1900, (see Public Laws and Resolutions of Philippine Com. 6-9,) he says:

"In all the forms of government and administrative provisions which they are authorized to prescribe, the commission should bear in mind that the government which they are establishing is designed not for our satisfaction or for the expression of our theoretical views, but for the happiness, peace and prosperity of the people of the Philippine Islands, and the measures adopted should be made to conform to their customs, their habits, and even their prejudices, to the fullest extent consistent with the accomplishment of the indispensable requisites of just and effective government;"

But he was careful to add:

"At the same time the commission should bear in mind, and the people of the islands should be made plainly to understand, that there are certain great principles of government which have been made the basis of our governmental system, which we deem essential to the rule of law and the maintenance of individual freedom, and of which they have, unfortunately, been denied the experience possessed by us; that there are also certain practical rules of government which we have found to be essential to the preservation of these great principles of liberty and law, and that these principles and these rules of government must be established and maintained in their islands for the sake of their liberty and happiness, however much they may conflict with the customs or laws of procedure with which they are familiar. It is evident that the most

enlightened thought of the Philippine Islands fully appreciates the importance of these principles and rules, and they will inevitably within a short time command universal assent. Upon every division and branch of the government of the Philippines, therefore, must be imposed these inviolable rules:

"That no person shall be deprived of life, liberty or property without due process of law; that private property shall not be taken for public use without just compensation; that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence; that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted; that no person shall be put twice in jeopardy for the same offence or be compelled in any criminal case to be a witness against himself; that the right to be secure against unreasonable searches and seizures shall not be violated; that neither slavery nor involuntary servitude shall exist except as a punishment for crime; that no bill of attainer or *ex post facto* law shall be passed; that no law shall be passed abridging the freedom of speech or of the press or of the rights of the people to peaceably assemble and petition the government for a redress of grievances; that no law shall be made respecting an establishment of religion or prohibiting the free exercise thereof, and that the free exercise and enjoyment of religious profession and worship without discrimination or preference shall forever be allowed."

These words are not strange to the American lawyer or student of constitutional history. They are the familiar language of the Bill of Rights, slightly changed in form, but not in substance, as found in the first nine amendments to the Constitution of the United States, with the omission of the provision preserving the right to trial by jury and the right of the people to bear arms, and adding the prohibition of the Thirteenth Amendment against slavery or involuntary servi-

tude except as a punishment for crime, and that of Art. 1, § 9, to the passage of bills of attainder and *ex post facto* laws. These principles were not taken from the Spanish law; they were carefully collated from our own Constitution, and embody almost verbatim the safeguards of that instrument for the protection of life and liberty.

When Congress came to pass the act of July 1, 1902, it enacted, almost in the language of the President's instructions, the Bill of Rights of our Constitution. In view of the expressed declaration of the President, followed by the action of Congress, both adopting, with little alteration, the provisions of the Bill of Rights, there would seem to be no room for argument that in this form it was intended to carry to the Philippine Islands those principles of our Government which the President declared to be established as rules of law for the maintenance of individual freedom, at the same time expressing regret that the inhabitants of the islands had not theretofore enjoyed their benefit.

How can it be successfully maintained that these expressions of fundamental rights, which have been the subject of frequent adjudication in the courts of this country, and the maintenance of which has been ever deemed essential to our Government, could be used by Congress in any other sense than that which has been placed upon them in construing the instrument from which they were taken?

It is a well-settled rule of construction that language used in a statute which has a settled and well-known meaning, sanctioned by judicial decision, is presumed to be used in that sense by the legislative body. *The Abbotsford*, 98 U. S. 440.

It is not necessary to determine in this case whether the jeopardy provision in the Bill of Rights would have become part of the law of the islands without Congressional legislation. The power of Congress to make rules and regulations for territory incorporated in or owned by the United States is settled by an unbroken line of decisions of this court and is no longer open to question. *American Ins. Co.* v. *Canter*, 1

Pet. 511; *Murphy* v. *Ramsey,* 114 U. S. 15; *Mormon Church* v. *United States,* 136 U. S. 1, 42, 43; *Downes* v. *Bidwell,* 182 U. S. 244; *Hawaii* v. *Mankichi,* 190 U. S. 197. This case does not call for a discussion of the limitations of such power, nor require determination of the question whether the jeopardy clause became the law of the islands after the ratification of the treaty without Congressional action, as the act of Congress made it the law of these possessions when the accused was tried and convicted.

It is argued that in the act of July 1, 1902, Congress recognized the jurisdiction of the Philippine courts in section 9 as follows:

"Sec. 9. That the Supreme Court and the courts of first instance of the Philippine Islands shall possess and exercise jurisdiction as heretofore provided, and such additional jurisdiction as shall hereafter be prescribed by the government of said islands, subject to the power of said government to change the practice and method of procedure."

The argument is, that Congress intended to leave the right of appeal as provided by military order, No. 58, as amended by the commission, in full force.

But Congress, in section 5, had already specifically provided that no person should be put twice in jeopardy of punishment for the same offense. While section 9 recognizes the established jurisdiction of the courts of the islands, it was not intended to repeal the specific guaranty of section 5, which is direct legislation pertaining to the particular subject. It is a well-settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling. *In re Rouse, Hazard & Co.,* 91 Fed. Rep. 96, 100, and cases therein cited; *Townsend* v. *Little,* 109 U. S. 504, 512.

In ascertaining the meaning of the phrase taken from the Bill of Rights it must be construed with reference to the common law from which it was taken. 1 Kent, Com. 336. *United*

*States* v. *Wong Kim Ark,* 169 U. S. 649, in which this court said:

"In this, as in other respects, it [a constitutional provision] must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution. *Minor* v. *Happersett,* 21 Wall. 162; *Ex parte Wilson,* 144 U. S. 417, 422; *Boyd* v. *United States,* 116 U. S. 616, 624, 625; *Smith* v. *Alabama,* 624 U. S. 465. The language of the Constitution, as has been well said, could not be understood without reference to the common law. 1 Kent's Com. 336; Bradley, J., in *Moore* v. *United States,* 91 U. S. 270, 274."

At the common law, protection from second jeopardy for the same offense clearly included immunity from second prosecution where the court having jurisdiction had acquitted the accused of the offense. The rule is thus stated by Hawkins in his Pleas of the Crown, quoted by Mr. Justice Story in *United States* v. *Gibert et al.,* 2 Sumner, 19, 39:

"The plea (says he) of *autre fois acquit* is grounded on this maxim, that a man shall not be brought into danger of his life for one and the same offence more than once. From whence it is generally taken by all our books, as an undoubted consequence, that where a man is once found not guilty, on an indictment or appeal, free from error, and well commenced before any court, which hath jurisdiction of the cause, he may by the common law, in all cases, plead such acquittal in bar of any subsequent indictment or appeal for the same crime."

In this court it was said by Mr. Justice Miller, in *Ex parte Lange,* 18 Wall. 163:

"The common law not only prohibited a second punishment for the same offence, but went further and forbid a second trial for the same offence, whether the accused had suffered punishment or not, and whether in the former trial he had been acquitted or convicted."

And in as late a case as *Wemyss* v. *Hopkins,* L. R. 10 Q. B. 378, it was held that a conviction before a court of competent

jurisdiction, even without a jury, was a bar to a second prosecution.

In that case the appellant had been summarily convicted before a magistrate for negligently and by wilful misconduct driving a carriage against a horse ridden by the respondent, and was afterwards convicted on the same facts for unlawful assault. It was held that the first conviction was a bar to the second. In the course of the opinion it was said by Blackburn, J.:

"I think the fact that the appellant had been convicted by justices under one act of Parliament for what amounted to an assault is a bar to a conviction under another act of Parliament for the same assault. The defence does not arise on a plea of *autre fois convict*, but on the well-established rule at common law, that where a person has been convicted and punished for an offence by a court of competent jurisdiction, *transit in rem judicatum*, that is, the conviction shall be a bar to all further proceedings for the same offence, and he shall not be punished again for the same matter; otherwise there might be two different punishments for the same offence. The only point raised is whether a defence in the nature of a plea of *autre fois convict* would extend to a conviction before two justices whose jurisdiction is created by statute. I think the fact that the jurisdiction of the justices is created by statute makes no difference. Where the conviction is by a court of competent jurisdiction it matters not whether the conviction is by a summary proceeding before justices or by trial before a jury."

In the same case it was said by Lush, J.: "I am also of opinion that the second conviction should be quashed, upon the ground that it violated a fundamental principle of law, that no person shall be prosecuted twice for the same offence. The act charged against the appellant on the first occasion was an assault upon the respondent while she was riding a horse on the highway, and it therefore became an offence for which the appellant might be punished under either of two

statutes. The appellant was prosecuted for the assault and convicted under one of the statutes, 3 and 4, Wm. IV, c. 50, § 78, and fined, and he therefore cannot be afterwards convicted again for the same act under the other statute."

It is true that some of the definitions given by the text-book writers, and found in the reports, limit jeopardy to a second prosecution after verdict by a jury; but the weight of authority, as well as decisions of this court, have sanctioned the rule that a person has been in jeopardy when he is regularly charged with a crime before a tribunal properly organized and competent to try him, certainly so after acquittal. *Coleman* v. *Tennessee*, 97 U. S. 509. Undoubtedly in those jurisdictions where a trial of one accused of crime can only be to a jury, and a verdict of acquittal or conviction must be by a jury, no legal jeopardy can attach until a jury has been called and charged with the deliverance of the accused. But, protection being against a second trial for the same offense, it is obvious that where one has been tried before a competent tribunal having jurisdiction he has been in jeopardy as much as he could have been in those tribunals where a jury is alone competent to convict or acquit. *People* v. *Miner*, 144 Illinois, 308; *State* v. *Bowen*, 45 Minnesota, 145; *State* v. *Layne*, 96 Tennessee, 668.

In *United States* v. *Sanges*, 144 U. S. 310, it was held that a writ of error did not lie in favor of the United States in a criminal case, Mr. Justice Gray said:

"From the time of Lord Hale to that of Chadwick's case, just cited, the text-books, with hardly an exception, either assume or assert that the defendant (or his representative) is the only party who can have either a new trial or a writ of error in a criminal case; and that a judgment in his favor is final and conclusive. See 2 Hawk. c. 47, § 12; c. 50, §§ 10 *et seq.;* Bac. Ab. Trial, L. 9; Error, B; 1 Chit. Crim. Law, 657, 747; Stark. Crim. Pl. (2d ed.) 357, 367, 371; Archb. Crim. Pl. (12th Eng. and 6th Am. ed.) 177, 199.

"But whatever may have been, or may be, the law of

England upon that question, it is settled by an overwhelming weight of American authority that the State has no right to sue out a writ of error upon a judgment in favor of the defendant in a criminal case, except under and in accordance with express statutes, whether that judgment was rendered upon a verdict of acquittal, or upon the determination by the court of a question of law."

In the course of the opinion Justice Gray cites, among other cases, *Com.* v. *Commings* and *Same* v. *McGinnis*, opinion by Chief Justice Shaw, 3 Cush. 212. In Archbold Cr. Pl. & Pr. Pomeroy's ed. 199, it was said: "There is no instance of error being brought upon a judgment for a defendant after an acquittal."

That the learned justice could not have intended to intimate that a second prosecution could be allowed by statute after an acquittal of the offense is shown by the subsequent decision of this court in *United States* v. *Ball*, 163 U. S. 662, in which Mr. Justice Gray also delivered the opinion of the court. In that case an attempt was made to prosecute for the second time one Millard F. Ball, who had been acquitted upon a defective indictment, which had been held bad upon the proceedings in error prosecuted by others jointly indicted with Millard F. Ball, who had been convicted at the trial. The court below held Ball's plea of former jeopardy to be bad. But this court reversed the judgment, and in the course of the opinion it was said:

"The Constitution of the United States, in the Fifth Amendment, declares, 'nor shall any person be subject to be twice put in jeopardy of life or limb.' The prohibition is not against being twice punished, but against being twice put in jeopardy; and the accused, whether convicted or acquitted, is equally put in jeopardy at the first trial. An acquittal before a court having no jurisdiction is, of course, like all the proceedings in the case, absolutely void, and therefore no bar to subsequent indictment and trial in a court which has jurisdiction of the offense. *Commonwealth* v. *Peters*, 12 Met. 387; 2 Hawk. P. C.

c. 35, § 3; 1 Bishop's Crim. Law, § 1028. But although the indictment was fatally defective, yet, if the court had jurisdiction of the cause and of the party, its judgment is not void, but only voidable by writ of error; and, until so avoided, cannot be collaterally impeached. If the judgment is upon a verdict of guilty, and unreversed, it stands good and warrants the punishment of the defendant accordingly, and he could not be discharged by a writ of *habeas corpus*. *Ex parte Parks*, 93 U. S. 18. If the judgment is upon an acquittal, the defendant, indeed, will not seek to have it reversed, and the government cannot. *United States* v. *Sanges*, 144 U. S. 310. But the fact that the judgment of a court having jurisdiction of the case is practically final affords no reason for allowing its validity and conclusiveness to be impugned in another case. . . . *As to the defendant who had been acquitted by the verdict duly returned and received, the court could take no other action than to order his discharge. The verdict of acquittal was final, and could not be reviewed, on error or otherwise, without putting him twice in jeopardy, and thereby violating the Constitution.* However it may be in England, in this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense. *United States* v. *Sanges*, 144 U. S. 310; *Commonwealth* v. *Tuck*, 20 Pick. 356, 365; *West* v. *State*, 2 Zabriskie [22 N. J. Law], 212, 231; 1 Lead. Crim. Cas. 532."

It is, then, the settled law of this court that former jeopardy includes one who has been acquitted by a verdict duly rendered, although no judgment be entered on the verdict, and it was found upon a defective indictment. The protection is not, as the court below held, against the peril of second punishment, but against being again tried for the same offense.

We are not here dealing with those statutes which give to the Government a right of review upon the steps merely preliminary to a trial and before the accused is legally put in jeopardy, as where a discharge is had upon motion to quash or a demurrer to the indictment is sustained before jeopardy

has attached. Such statutes have been quite generally sustained in jurisdictions which deny the right of second trial where a competent court has convicted or acquitted the accused. *People* v. *Webb*, 38 California, 467. Mr. Bishop, in his work upon Criminal Law, sums up the scope and authority of such statutes as follows:

"A legislative provision for the rehearing of criminal causes cannot be interpreted—or, at least, it cannot have force—to violate the constitutional rule under consideration, whatever be the words in which the provision is expressed. When, therefore, a defendant has been once in jeopardy, the jeopardy cannot be repeated without his consent, whatever statute may exist on the subject. Such a statute will be interpreted with the Constitution, and be held to apply only to cases where it constitutionally may. And if it undertakes to give to the State the right of appeal, to retry the party charged, after acquittal, it is invalid. And so the writ of error, or the like, allowed to the State, can authorize the State to procure the reversal of erroneous proceedings and commence anew, only in those cases in which the first proceeding did not create legal jeopardy." 1 Bishop Criminal Law (5th ed.), § 1026.

The author's conclusion has support in the case of *People* v. *Miner*, 144 Illinois, 308, *supra*, wherein a statute giving an appeal when the accused had been acquitted before a competent tribunal, was held in violation of section 10, article 2, of the constitution of that State, providing that no person shall be put twice in jeopardy for the same offense. So in the case of *People* v. *Webb*, 38 California, 467, a statute undertaking to give the right of appeal to the people in criminal cases was held to be limited to the cases in which errors in the proceedings may occur before legal jeopardy has attached. In the course of a well-considered opinion it was said:

"The question thus presented is of most grave importance, and, so far as we are advised, has never been directly passed upon by this court; hence we have given it a most patient consideration, and after a careful examination of the authorities

as to the construction of similar provisions in the constitutions of other States, and the Constitution of the United States, we are entirely satisfied that this court has no authority in criminal cases, under our State constitution, to order a new trial of a defendant at the instance of the prosecution for mere errors in the ruling of the court during the progress of the trial after the jury have been charged with the case and have rendered a verdict of not guilty. No case has been called to our attention, and after a most diligent examination of authorities, we have not been able to find a single American case where a retrial has been ordered or sanctioned by an appellate court at the instance of the prosecution, after the defendant had once been put upon his trial for an alleged felony, upon a valid indictment before a competent court and jury and acquitted by the verdict of such jury; but we find a vast number of adjudications of the highest judicial tribunals of the different States and many of the Federal courts to the effect that no such retrial is authorized by the common law, and is directly interdicted by the Constitution of the United States, and also of most of the several States. The universal maxim of the common law of England, as Sir William Blackstone expresses it, '*that no man is to be brought into jeopardy of his life more than once for the same offence,*' is embraced in article V of amendments to the Constitution of the United States, and in the constitutions of several States, in the following language: '*Nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb;*' and in many other States the same principle is incorporated in the organic law, in language substantially the same as hereinbefore quoted from the constitution of this State. While the constitutions of some few States are destitute of this or any similar provision, other state constitutions, such as of New Hampshire, Rhode Island, New Jersey and Iowa, merely interdict a second trial for the same offence after acquittal."

The case of *State* v. *Lee*, 65 Connecticut, 265, in the reasoning of the court seems opposed to this view. But no reference

is made in the course of the opinion to any constitutional requirement in Connecticut as to double jeopardy. An examination of the constitution of that State and amendments as published in General Statutes of Connecticut Revision of 1902, discloses no provision upon the subject of jeopardy, and we conclude there is none.

The exceptional character of the decision in *State* v. *Lee* is stated by the learned editor of American State Reports in a note to the case as reported in 48 Am. St. Rep. 202, in the following language:

"This case, in its view of former jeopardy, stands out in bold relief against the commonly understood meaning of what constitutes once in jeopardy."

And further:

"The law almost universally prevalent is that a verdict of acquittal in a criminal case is final and conclusive, and that there can be no new trial of a criminal prosecution after an acquittal in it." *People* v. *Corning*, 2 N. Y. 9; 49 Am. Dec. 364, and note; 48 Am. St. Rep. 213, 214.

The *Ball* case, 163 U. S., *supra*, establishes that to try a man after a verdict of acquittal is to put him twice in jeopardy, although the verdict was not followed by judgment. That is practically the case under consideration, viewed in the most favorable aspect for the Government. The court of first instance, having jurisdiction to try the question of the guilt or innocence of the accused, found Kepner not guilty; to try him again upon the merits, even in an appellate court, is to put him a second time in jeopardy for the same offense, if Congress used the terms as construed by this court in passing upon their meaning. We have no doubt that Congress must be held to have intended to have used these words in the well settled sense as declared and settled by the decisions of this court.

It follows that military order No. 58, as amended by act of the Philippine Commission, No. 194, in so far as it undertakes to permit an appeal by the government after acquittal, was

repealed by the act of Congress of July, 1902, providing immunity from second jeopardy for the same criminal offense.

This conclusion renders it unnecessary to consider, if the question was presented in this case, whether the accused was entitled to the right of a trial by jury.

*Judgment reversed and prisoner discharged.*

MR. JUSTICE HOLMES, with whom concurred MR. JUSTICE WHITE and MR. JUSTICE McKENNA, dissenting.

I regret that I am unable to agree with the decision of the majority of the court. The case is of great importance, not only in its immediate bearing upon the administration· of justice in the Philippines, but, since the words used in the Act of Congress are also in the Constitution, even more because the decision necessarily will carry with it an interpretation of the latter instrument. If, as is possible, the constitutional prohibition should be extended to misdemeanors, *Ex parte Lange*, 18 Wall. 163, 173, we shall have fastened upon the country a doctrine covering the whole criminal law, which, it seems to me, will have serious and evil consequences. At the present time in this country there is more danger that criminals will escape justice than that they will be subjected to tyranny. But I do not stop to consider or to state the consequences in detail, as such considerations are not supposed to be entertained by judges, except as inclining. them to one of two interpretations, or as a tacit last resort in case of doubt. It is more pertinent to observe that it seems to me that logically and rationally a man cannot be said to be more than once in jeopardy in the same cause, however often he may be tried. The jeopardy is one continuing jeopardy from its beginning to the end of the cause. Everybody agrees that the principle in its origin was a rule forbidding a trial in a new and independent case where a man already had been tried once. But there is no rule that a man may not be tried twice in the same case. It has been decided by this court that he may be tried a second time, even for his life, if the jury

disagree, *United States* v. *Perez*, 9 Wheat. 579; see *Simmons* v. *United States*, 142 U. S. 148; *Logan* v. *United States*, 144 U. S. 263; *Thompson* v. *United States*, 155 U. S. 271, or notwithstanding their agreement and verdict, if the verdict is set aside on the prisoner's exceptions for error in the trial. *Hopt* v. *People*, 104 U. S. 631, 635; 110 U. S. 574; 114 U. S. 488, 492; 120 U. S. 430, 442; *United States* v. *Ball*, 163 U. S. 662, 672. He even may be tried on a new indictment if the judgment on the first is arrested upon motion. *Ex parte Lange*, 18. Wall. 163, 174; 1 Bish. Crim. Law (5th ed.), § 998. I may refer further to the opinions of Kent and Curtis in *People* v. *Olcott*, 2 Johns. Cas. 301; S. C., 2 Day, 507, n.; *United States* v. *Morris*, 1 Curtis, 23, and to the well-reasoned decision in *State* v. *Lee*, 65 Connecticut, 265.

If a statute should give the right to take exceptions to the Government, I believe it would be impossible to maintain that the prisoner would be protected by the Constitution from being tried again. He no more would be put in jeopardy a second time when retried because of a mistake of law in his favor, than he would be when retried for a mistake that did him harm. It cannot matter that the prisoner procures the second trial. In a capital case, like *Hopt* v. *People*, a man cannot waive, and certainly will not be taken to waive without meaning it, fundamental constitutional rights. *Thompson* v. *Utah*, 170 U. S. 343, 353, 354. Usually no such waiver is expressed or thought of. Moreover, it cannot be imagined that the law would deny to a prisoner the correction of a fatal error, unless he should waive other rights so important as to be saved by an express clause in the Constitution of the United States.

It might be said that when the prisoner takes exceptions he only is trying to get rid of a jeopardy that already exists—that so far as the verdict is in his favor, as when he is found guilty of manslaughter upon an indictment for murder, according to some decisions he will keep it and can be retried only for the less offense, so that the jeopardy only is con-

tinued to the extent that it already has been determined against him, and is continued with a chance of escape. I believe the decisions referred to to be wrong, but, assuming them to be right, we must consider his position at the moment when his exceptions are sustained. The first verdict has been set aside. The jeopardy created by that is at an end, and the question is what shall be done with the prisoner. Since at that moment he no longer is in jeopardy from the first verdict, if a second trial in the same case is a second jeopardy even as to the less offense, he has a right to go free. In view of these difficulties it has been argued that on principle he has that right if a mistake of law is committed at the first trial. 1 Bish. Crim. Law (5th ed.), §§ 999, 1047. But even Mr. Bishop admits that the decisions are otherwise, and the point is settled in this court by the cases cited above. That fetish happily being destroyed, the necessary alternative is that the Constitution permits a second trial in the same case. The reason, however, is not the fiction that a man is not in jeopardy in case of a misdirection, for it must be admitted that he is in jeopardy, even when the error is patent on the face of the record, as when he is tried on a defective indictment, if judgment is not arrested. *United States* v. *Ball*, 163 U. S. 662. Moreover, if the fiction were true, it would be equally true when the misdirection was in favor of the prisoner. The reason, I submit, is that there can be but one jeopardy in one case. I have seen no other, except the suggestion of waiver, and that I think cannot stand.

If what I have said so far is correct, no additional argument is necessary to show that a statute may authorize an appeal by the Government from the decision by a magistrate to a higher court, as well as an appeal by the prisoner. The latter is every day practice, yet there is no doubt that the prisoner is in jeopardy at the trial before the magistrate, and that a conviction or acquittal not appealed from would be a bar to a second prosecution. That is what was decided, and it is all that was decided or intimated, relevant to this case, in *Wemyss*

v. *Hopkins,* L. R. 10 Q. B. 378.   For the reasons which I have stated already, a second trial in the same case must be regarded as only a continuation of the jeopardy which began with the trial below.

MR. JUSTICE BROWN dissenting.

Under our Anglo-Saxon system of jurisprudence I have always supposed that a verdict of acquittal upon a valid indictment terminated the jeopardy, that no further proceedings for a review could be taken either in the same or in an appellate court, and that it was extremely doubtful whether even Congress could constitutionally authorize such review.

Conceding all this, however, I think that in applying the principle to the Philippine Islands, Congress intended to use the words in the sense in which they had theretofore been understood in those Islands.   By that law, in which trial by jury was unknown, the jeopardy did not terminate, if appeal were taken to the audiencia or Supreme Court, until that body had acted upon the case.   The proceedings before the court of first instance were in all important cases reviewable by the Supreme Court upon appeal, which acted finally upon the case and terminated the jeopardy.   This was evidently the view of the military commander in General Order, No. 58, and of the Philippine Commission in the act of August 10, 1901, (No. 194,) in both of which an appeal to the Supreme Court was contemplated, even after a judgment of acquittal. I think this also must have been the intention of Congress, particularly in view of sec. 9 of the Philippine act of July 1, 1902, which provided that "the Supreme Court and the courts of first instance of the Philippine Islands shall possess and exercise jurisdiction *as heretofore provided* . . . subject to the power of said government to change the practice and method of procedure."   It seems to me impossible to suppose that Congress intended to place in the hands of a single judge the great and dangerous power of finally acquitting the most notorious criminals.