by the parties no final order will be entered by this court unless for cause hereafter shown.

**PEOPLE OF THE VIRGIN ISLANDS**
**v.**
**BRODHURST**

No. 8721

Circuit Court of Appeals

Third Circuit

Argued November 22, 1944

Decided March 21, 1945

*See, also, 148 F.2d 636*

GEORGE H. T. DUDLEY, Charlotte Amalie, Virgin Islands, *for appellant*

JAMES A. BOUGH, Charlotte Amalie, Virgin Islands, *for appellee*

ERNEST FLEISCHMAN, New York City, *amicus curiae*

Before MARIS and GOODRICH, *Circuit Judges*, and Frederic P. SCHOONMAKER, *District Judge*

MARIS, *Circuit Judge*

This is an appeal from a judgment of the District Court of the Virgin Islands, Division of St. Croix, at

Christiansted.[1] The defendant was adjudged guilty of criminal contempt in a summary proceeding and sentenced to serve ten days in prison. The execution of the sentence was stayed by the District Court pending this appeal. To understand the questions raised by the appeal it will be necessary to detail some of the events which preceded the alleged contempt.

Harry Beatty, a white man, had been charged with murder in the second degree for having shot and killed Andrew Thompson, a Negro. The shooting took place on the island of St. Croix which has a population of twelve thousand people, approximately 95% of whom are Negroes and 5% white. The case was one which aroused intense interest among the people of St. Croix and feeling regarding it ran very high in the community. Beatty waived his right to trial by jury. In spite of much public clamor the judge of the District Court did not order a jury trial but proceeded to try the case himself.[2] The prosecution called two witnesses, white men who were friends of the defendant. The defendant testified on his own behalf. They all testified that Beatty was a game warden, that he attempted to take from Thompson an unlicensed shotgun with which he suspected Thompson had shot game unlawfully, that Thompson resisted and aimed his shotgun at Beatty and was about to shoot Beatty and that Beatty thereupon in self defense

[1]The District Court of the Virgin Islands consists of two divisions, one constituted by the Municipality of St. Croix and the other by the Municipality of St. Thomas and St. John. Section 27, Organic Act (1936) of the Virgin Islands of the United States, 49 Stat. 1813 (prec. 1 V.I.C.), 48 U.S.C. § 1405z. Each of the two municipalities has by ordinance enacted its own code of substantive and procedural law.

[2]"In any criminal case originating in said district court, no person shall be denied the right to trial by jury on the demand of either party: Provided, That if no jury is demanded the case shall be tried by the court without a jury: Provided further, That the judge of the district Court may, on his own motion, order a jury for the trial of any criminal action: . . ." Section 31, Organic Act (1936), 49 Stat. 1814 (prec. 1 V.I.C.), 48 U.S.C. § 1406c.

451

shot Thompson. It appeared further that the revolver with which Beatty shot Thompson was also unlicensed and that Beatty's official position was not generally known. Since there were no witnesses to the shooting other than Beatty and his two friends their version of what occurred remained uncontradicted. The judge of the District Court, accepting the recited facts as established by the evidence, entered a judgment of acquittal on June 7, 1944. In rendering this judgment the judge delivered an opinion in which he discussed the evidence and his duty with respect to the case in a manner which reflects great credit upon his character and demonstrates his ability to administer the law impartially and justly in an atmosphere of intense public excitement and under circumstances which doubtless compelled him to subordinate his own natural feelings.[3] The judge returned to St. Thomas on June 7th. The islands of St. Thomas and St. Croix are forty miles apart.

On June 12, 1944, the defendant published in his daily newspaper, The St. Croix Avis, in Christiansted the following unsigned letter:

[3]For example, in speaking of the two men who were the only witnesses to the shooting Judge Moore said, "I have taken into consideration the fact that these two witnesses live in the same house with the defendant; that their home is in Louisiana where the life of Negroes is cheap; that the defendant may have had the same feeling about the life of a Negro. However, there is nothing in the evidence to contradict this testimony, and certainly this Court would not be warranted under any theory of law to throw out the testimony of witnesses merely because of the section of the country from which they come. I have been in Louisiana and, as a Negro myself, I know the feeling toward Negroes in Louisiana, but no court can decide a case except upon the evidence which is presented to it. Unrestrained mob hysteria in a colored community against white people is just as dangerous and reprehensible as unrestrained mob hysteria in the south against Negroes. Two wrongs do not make a right. I was born in the heart of Mississippi. I know well the injustices against colored people there, but if Senator Bilbo of Mississippi, or Congressman Rankin of Mississippi had a case in this Court, they would receive justice according to the evidence, and not according to the action of the white people in Mississippi against Negroes. That is the way it must be in a Court of Justice, and no mob hysteria should ever make it otherwise."

"Editor of St. Croix Avis
"Christiansted, V. I.

"Kindly insert the following in your paper:

"As the mass left the Court Room last Wednesday after having heard the decision of the case of Harry Beatty by Judge Moore, there were cries of discontent and indignation,

"What have we left they said? 'Justice even is against us'. We are the masses of this island but we are trampled under heels of the Hitlerites and bribe and injustice rule out reason. Our legislators tax us, we pay willingly and gladly, but when jobs are available with any decent salary we are forgotten, and a white continental is either sent for, or given the job that a native could have taken and done better with.

"If we are hungry, and we fish in the sea (God's sea) we are told by the Hitlerites 'You Trespass'. If you shoot game, yes even with an old medieval gun, such as Rip Van Winkle used, and on your own property, you are shot as a dog and that's nothing, even though you are shot with an unlicensed gun. It's fine. Our money is paid the chosen few in bulks, and only when a crime is committed, we known a man was a warden, and $200.00 or $300 or even $1000 a month to avoid shooting game and shoot human beings of this said masses. If that job is left off and one of the masses that are eligible applies for it, it will be dropped to may be $50.00 a month with more work added and no leisure attached.

"Our Nurses, Teachers, Policemen, Janitors, Street Cleaners, all have to toil doubly hard but they are of the masses, and must accept a pittance of a salary, and if they squawk for more they are automatically ousted.

453

They justly deserve $200 or $300 or even $100 [sic] a month for they are over worked, and every civic need they are called upon for. Yet the fellows who have joined the Hitler gang get plenty of leisure, bigger salaries, they are not called upon for any extra duties of civic needs or war time sacrifice, and 10 to one they will be left out of being drafted on one pretext or the other, so that their lives may be preserved to go on oppressing their fellowmen.

"How long are we to stand this kind of thing here in St. Croix we do not know but we do know that all oppressed people have a day of liberation in their History. It seems as if we stand alone here and the surest thing would be to all get off the island and let these Carpetbaggers see who will fill their purses.

"If we do not pay our taxes promptly our property is sold on public auction but there are some of these Hitlerites who owe for years, yes generations, and this deficit in our Treasury is never mentioned; never even thought of. Why? Because they are things owned by the Minority who rules. It seems as if the only decent thing left for masses to do is to appeal to Washington for help either to rid us of these unwanted parasites and send people with just minds and if possible dissolve our Council.

"We have men who can stand for integrity and honor and who can do justice even though the heavens should fall but they are poor and silenced as they open their mouths and crushed out of the jobs they hold or denied 100 and one rights of an American Citizen if they dare come forward.

"These Hitlerites retard progress in the island, for they want to monopolize everything and if other well-thinking people come here with plans to improve they

are quickly chased back to the mainland, or told 1000 things that the Island hasn't.

"Every progressive move they try to kill, 'nothing', they say, will work here. They do not say they are afraid of the people who may enter with progressive ideas and crush them out and so find hindrances one after another.

"This is not a race quarrel: those who are fair with us receive what they give. Our people here are known all over for their kindness and hospitality to all — but we have feelings too and like the Invaders of our Allies, can strike so sudden as to create lasting shock. Here in St. Croix the trend is Justice versus poverty."

On his own motion on June 16, 1944, the judge of the District Court entered an order directing that the defendant be served with a citation to appear in the District Court at Christiansted on June 17, 1944, and show cause why he should not be punished for contempt for the publication of the article just quoted. On the same day the defendant was served with the citation by the United States Marshal who advised the defendant that the judge had requested that the defendant be told that because of the seriousness of the charge he might employ counsel if he so desired. The defendant appeared in person in the District Court on June 17, 1944, but without counsel. Thereupon the judge made a preliminary statement, to the effect that the only recourse left to the defendant was to make public apology for the publication. He asked the defendant if he had counsel and was told that he did not have. The judge caused selected portions of the published letter to be read aloud and solicited the defendant's comments. At the conclusion of the hearing the judge delivered his opinion from the bench,[4] entered a judgment in which he found the de-

[4]The opinion delivered by Judge Moore in the case of this defendant and of Paul E. Joseph, Editor of the West End News, who also was cited for contempt at the same time, was as follows:

"The defendants have forced me to a very unpleasant duty. There is only one way under the law in which a defendant can purge himself of contempt and that is by a full and open apology to the court, but you have seen fit, and have chosen not to apologize. Instead, you have shown open contempt even in the presence of the court.

"I fully realize that your attitude toward this court and even your criticisms of this Court is based upon to total misconception of the law, and that the wave of mob hysteria is also based both on that misconception coupled with racial feelings. And while this court wants to do everything within its power to have the people understand the law, this Court cannot and will not fail to enforce the law because you and those infected with mob hysteria cannot be made to understand the law in its proper relationship with that hysteria. Both of you editors and also the mob hysteria which you have excited against the Court is steeped in the belief that the family of the deceased in the Beatty case were entitled to a jury trial. You do not realize even yet that the defendant Beatty having waived his right of trial by jury and having asked to be tried by the court, that the family of the deceased was not a party to the proceedings against Beatty and had no right to demand a jury after the defendant Beatty had waived his right of trial by jury. Further, you do not realize that the mob hysteria which prevailed then against the defendant Beatty and now has been incited against the Court by your articles is the very reason why it became the duty of this Court to try the case after the defendant waived his right of trial by jury.

"In view of this misconception of the law, this Court is very much grieved at the results as here and now- shown by the present wave of mob hysteria, but this court is, nevertheless, compelled to protect its dignity and to maintain the proper respect for the Court and for law and order.

"I was born in Mississippi. I am a member of the Negro race, and I know and feel injustice to Negroes as much as anyone. My father was one of the largest tax payers in a small town in Mississippi. He paid taxes for schools that I could not attend. I have been to Louisiana. I finished High School in Louisiana. I have known discrimination in the South at its worst. There isn't a man in this court room who knows more of the persecution of my group that I do. And here are two men who are doing the greatest disservice to a people that they could ever possibly do. Here are two men that are riding upon a wave of discontent in Saint Croix and instead of directing that discontent in the channels where it would do these people some good, they are maliciously placing it upon this Court when they, as leaders, ought to know that this is wrong. As intelligent men and leaders in this community, you ought to know that this Court has nothing to do with obtaining jobs and placing people in them. As intelligent men you ought to know that this Court has nothing to do with the political life of this community. As intelligent men you ought to know that this Court is concerned only with trying the guilt or innocence of people that come before this Court; and this Court has nothing to do with the political affairs of this community. You ought to know that this Court has nothing to do with the administration of the island's economic problems. This Court does not even employ its own employees; the District Attorney, the Marshal, and all of the other employees; much less anyone outside the pale of the Court. I can say to you with all sincerity that I had hoped there would be an open apology from you. I had hoped that you would say that you really did not intend to

456

fendant guilty of contempt of court as defined by Title IV, chapter 4, section 35-3, of the (1921) Code of Laws for the Municipality of St. Croix (14 V.I.C. § 581 note), and sentenced him to ten days in jail.

From the judgment thus rendered the defendant took the present appeal, in support of which he urges that the publication was not in fact a criticism of the District Court or of the judge; that the St. Croix Code,[5] when properly construed, does not authorize punishment in a summary proceeding for a contempt of the character charged; and that if the St. Croix Code is construed to authorize such a summary proceeding it must be held to that extent to have been repealed by the subsequent enactment of the Organic Act.[6]

We think it is quite clear that if the publication was a scurrilous or libelous criticism of the judgment of the

attack the court, instead of getting up here and attempting to play up to the unenlightened gallery, and taking a further open contemptuous attitude toward this court and its present proceedings. You should not attempt to encourage the people to mob rule, by setting them against the Court. You should know too that being a member of that persecuted race, that the very things we have always fought for at all times is to uphold the Constitution of the United States while our enemies were fighting to destroy and circumvent it. You should know that this Court is trying to maintain law and order and that this Court will not be governed by mob rule. You should know that if this Court gave way to mob rule, it would be the worst day in the history of this island. Our enemies would be delighted to use this against us. I took an oath of office to administer the law the same to the rich and to the poor, not to favor one and prosecute the other. The Court must be guided only by the evidence presented to it in every case. You were at the Beatty trial; you heard everything that went on in the Beatty case. I did not exclude the spectators from the court room, and as leaders in this community you should know better. Consequently, this is a sad duty for the Court to perform, but nevertheless you have left me no other alternative but to enforce the law, and to uphold the dignity of this Court in spite of your attacks.

"Therefore, it is the finding of this Court that Mr. Canute A. Brodhurst, Sr., Editor of the St. Croix Avis, is Guilty of Contempt of this Court; . . ."

[5]The Code of Laws for the Municipality of St. Croix was enacted by an ordinance of the Colonial Council for St. Croix approved by the Governor June 15, 1920, effective August 1, 1920.

[6]The Organic Act of the Virgin Islands of the United States, 49 Stat. 1807 (prec. 1 V.I.C.), 48 U.S.C. § 1405 et seq., was approved June 22, 1936, effective the same date.

District Court which would tend to bring that court or its judge into undeserved disrepute it was a criminal contempt within the meaning of the St. Croix Code. In view of our conclusions upon the other questions raised on the appeal, however, it is unnecessary for us to pass upon the defendant's contention that the court erred in finding the publication to be of the character described. We will, therefore, assume that it was in fact such a contempt as the St. Croix Code describes and pass to the consideration of the questions of law which the defendant raises.

The first of these questions is whether the St. Croix Code confers upon the District Court power to punish in a summary proceeding a person guilty of such a criminal contempt. It is only if this question is answered in the affirmative that the further question arises whether the St. Croix Code, insofar as it authorizes summary punishment for such a contempt, has been repealed by the Organic Act by reason of its being, as thus construed, inconsistent with the freedom of speech and of the press which is guaranteed against abridgment by that Act. We, therefore, turn to the examination of those provisions of the St. Croix Code which deal with the subject of contempts.

The District Attorney for the Virgin Islands urges that the applicable provisions of the St. Croix Code (1921) are contained in Title IV, chapter 4, sections 35, 36 and 37 (14 V.I.C. § 581 note). Those sections are as follows:

"Section 35. — The courts duly established in the District shall have power to punish for criminal contempt, any person or persons guilty of any of the following acts:

"1. — Breach of the peace, noise or other disturbance directly tending to interrupt its proceedings, or disorderly, contemptuous or insolent conduct towards a court or justice thereof, in its presence or during its session and tending to interrupt its proceedings, or in the presence of a jury while actually sitting or deliberating in any case.

458

"2. — Willful disobedience of, or resistance offered to or exerted against any lawful writ, mandate or order issued or made by any such court in a suit or action pending therein.

"3. — Scurrilous or libelous criticism of the orders, judgments, writs or proceedings of any court published in any public print or newspaper or circular for circulation tending to bring the court or any of its members into undeserved disrepute.

"4. — The unlawful or contumacious refusal of any person to be sworn or properly qualified as a witness in any case pending in such court, or after being sworn or qualified, the refusal without lawful excuse, to answer any legal interrogatory.

"5. — The willful publication of any false or grossly inaccurate report of judicial proceedings.

"Provided, however, that the publication of any true and fair report of any judicial proceeding shall not be punishable as a contempt.

"Section 36. — The courts shall have authority to punish a contempt against their authority by imprisonment not exceeding a period of thirty days, or by a fine not exceeding two hundred dollars or by both such fine and imprisonment, in the discretion of the court.

"Section 37. — When contempt is committed in the immediate presence and view of the court, the punishment therefor may be imposed immediately by the judge of the court. When such a person is charged with contempt committed out of the presence of the court, no conviction can be had thereon, unless the person so charged shall have been given an opportunity to appear and defend against the charge, and whenever a person is fined or committed to jail for a contempt of court, an order or warrant for such fine or imprisonment must be signed by the judge delivering such sentence, setting forth the act or acts constituting such contempt, with the time and place of the commission thereof and the circumstances, and specifying the sentence of the court; otherwise such sentence will be wholly invalid and inoperative."

Section 35, it will be seen, confers authority upon the District Court to punish for criminal contempts without differentiating between contempts committed within the immediate presence and view of the court (e.g., those described in subsections 1 and 4) and those committed

459

out of the presence of the court (e.g., those described in subsections 2, 3, and 5). Both subsections 3 and 5 of section 35 authorize punishment for contempts by publication which would ordinarily be committed out of the presence of the court. Section 37, which does make a distinction between contempts committed in and out of the presence of the court, provides for a summary proceeding in either case, merely adding the requirement in the case of a contempt committed out of the presence of the court that the defendant shall be given an opportunity to appear and defend against the charge. It will thus be seen that Title IV, chapter 4, gives express authority to the District Court to punish a defendant summarily for the contempts by publication which are defined in section 35-3 of the chapter.

The defendant calls our attention to Title III, chapter 55, section 3, of the St. Croix Code (1921; 14 V.I.C. § 581 note) which provides:

"Section 3. — When a contempt is committed in the immediate view and presence of the court or officer, it may be punished summarily for which an order must be made reciting the facts as occurring in such immediate view and presence, determining that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed. In other cases of contempt the trial shall proceed as in criminal cases."

He urges that by virtue of this section the power to punish summarily is limited to those contempts which are committed in the immediate view and presence of the court. He argues that it must follow that a contempt by publication which is committed out of the view and presence of the court may not be punished summarily but must be tried and punished in accordance with all the safeguards accorded a defendant in a criminal case.[7]

[7]We mention but a few of the safeguards found in Title V of the St. Croix Code (1921). Prosecution must be by information filed in open court by one of the government attorneys (chapter 1, section 3 [5 V.I.C. § 3581]); the information must be read to the defendant in open court and a copy

We do not think that the procedural provisions of this section are applicable to the contempts defined and made punishable by Title IV, chapter 4, section 35 (14 V.I.C. § 581 note), however. The section upon which the defendant relies is, as we have said, contained in Title III, chapter 55 (14 V.I.C. § 581 note). Section 1 of that chapter defines twelve species of contempts of court and section 2 makes them punishable by fine or imprisonment. The procedure for the punishment for contempt outlined in section 3 of the chapter applies only to those contempts which are defined and made punishable by the preceding sections of the chapter. Contempt by publication of a scurrilous or libelous criticism of the court is not one of the contempts defined by section 1 of chapter 55 and its punishment is accordingly not governed by the provisions of section 3 of the chapter.

It is true that there is some duplication in the species of contempts defined by Title III, chapter 55, and by Title IV, chapter 4. Thus the first, second and fourth species of contempt defined by Title IV, chapter 4, section 35, are the substantial equivalents of the first, second, sixth and tenth species defined by Title III, chapter 55, section 1. Just why these duplicating provisions were included in the St. Croix Code and just how the apparent conflicts with regard to procedure and punishment for those contempts which are defined by both chapters may be resolved we are not called upon in this case to consider. Perhaps there may be some significance in the fact that Title III relates to civil procedure and may, therefore,

delivered to him (chapter 6, section 2 [5 V.I.C. § 3501 note]); the defendant must be informed by the court that it is his right to have counsel before being arraigned and must be asked if he desires the aid of counsel (chapter 6, section 3 [5 V.I.C. § 3503 note]); the defendant must be allowed until the day after arraignment to answer the information (chapter 6, section 5 [5 V.I.C. § 3501 note]); if he so requests the defendant may have five days to prepare for trial (chapter 11, section 3 [5 V.I.C. § 3501 note]); the defendant may, when the charge amounts to a felony, demand a trial by jury (chapter 12, section 1 [5 V.I.C. § 3601]).

more appropriately deal with civil contempts, whereas Title IV relates to criminal law and accordingly should properly treat of criminal contempts. It is sufficient for the purposes of this case to state that the provisions of Title III, chapter 55, section 3, do not restrict the power conferred upon the district court by Title IV, chapter 4, sections 35, 36 and 37, to punish summarily as provided in section 37 the contempts by publication defined by section 35-3.

■ By reason of our conclusion that Title IV, chapter 4, of the St. Croix Code authorizes summary punishment for contempt committed by a publication of the character here involved, it becomes necessary for us to determine the remaining question in the case, namely, whether the St. Croix Code is, to the extent that it authorizes such summary punishment, inconsistent with the freedom of speech and of the press guaranteed by the Organic Act against abridgment by insular legislation. The St. Croix Code was enacted by the Colonial Council for St. Croix on June 15, 1920, and went into effect on August 1, 1920. The Organic Act was enacted on June 22, 1936, and became effective upon its enactment. Section 18 of the Organic Act (1936; prec. 1 V.I.C.) provides that "The laws of the United States applicable to the Virgin Islands on the date of enactment of this Act, and all local laws and ordinances in force on such date in the Virgin Islands, not inconsistent with this Act, shall continue in force and effect."[8] The Organic Act thereby continued in force so much but only so much of the St. Croix Code as was not inconsistent with the Organic Act and it repealed all the provisions of the St. Croix Code which were inconsistent with any of its provisions.

The defendant urges that the provisions of Title IV, chapter 4, of the St. Croix Code (14 V.I.C. § 581 note),

[8] 49 Stat. 1811, 48 U.S.C. § 1405q.

insofar as they furnish authority for his summary conviction by the District Court in this case, were repealed by section 18 of the Organic Act (1936) since they are inconsistent with the provisions of section 34 of that Act[9] that "No law shall be passed abridging the freedom of speech or of the press . . ." Section 34 of the Organic Act contains a comprehensive bill of rights for the inhabitants of the Virgin Islands. By the sentence just quoted the Organic Act guarantees to the inhabitants of the islands in the very language of the First Amendment to the Constitution of the United States (prec. 1 V.I.C.) the same freedom of speech and of the press which is safeguarded to the inhabitants of the United States by the First and Fourteenth Amendments (prec. 1 V.I.C.).[10] The construction which has been placed upon those amendments is, therefore, determinative as to the interpretation and effect of the language of the Organic Act.

■ The extraordinary power of a court to impose summary punishment for criminal contempts of its authority is based upon the necessity for speedily and adequately dealing with conduct which obstructs the procedure of the court and prevents it from carrying out its judicial functions. It was because of the importance of enabling the judicial branch of the government to perform unimpeded its high constitutional functions that the safeguards ordinarily applied in criminal cases were relaxed in this situation. Ex parte Hudgings (1919) 249 U.S. 378, 383, 39 S. Ct. 337, 63 L.Ed. 656, 11 A.L.R. 333. Although directed primarily to obstructive conduct in the presence of the judge the power was early extended to include constructive contempts committed out of the

[9] 49 Stat. 1815, 48 U.S.C. § 1406g.
[10] "The freedom of speech and of the press secured by the First Amendment . . . against abridgment by the United States is similarly secured to all persons by the Fourteenth [Amendment] against abridgment by a state." Schneider v. State (1939) 308 U.S. 147, 160, 60 S. Ct. 146, 150, 84 L. Ed. 155.

presence of the court but which were nevertheless found to obstruct its processes or impair its authority.[11]

■ ■ One type of constructive contempt frequently dealt with was contempt by the publication of a criticism of the court. In England, and to some extent in this country, such criticisms if defamatory or tending to bring the court into disrepute were treated as contempts and summarily punished as such without considering whether they actually obstructed the administration of justice. The use of the contempt power in the case of publications involving merely defamatory criticism of the court or judge has been much criticized in England.[12] In this country it runs squarely afoul of the constitutional guarantees of the right to speak and print freely in criticism of the conduct of public officers, judges as well as others.[13] For these guarantees are but an expression of the belief of the founders of our nation that the preservation of freedom to criticize the acts of public officials is essential to the maintenance of democratic control over the processes of government.

Recently the constitutional limitation upon the exercise of the contempt power in the case of defamatory publications was reiterated in Bridges v. California (1941) 314 U.S. 252, 62 S. Ct. 190, 86 L. Ed. 192. In that case the power of a California court to punish as a contempt a publication criticizing the court was denied because the publication, although defamatory, did not present a clear and present danger of obstructing the fair and orderly

[11]See Nelles & King, Contempt by Publication, 28 Columbia L. Rev. 401-431; 525-562 (1928); Thomas, Problems of Contempt of Court, pp. 7-11, 19-36 (1934).

[12]Laski, Procedure for Constructive Contempt in England, 41 Harv. L. Rev. 1031 (1927-28); Goodhart, Newspapers and Contempt of Court in English Law, 48 Harv. L. Rev. 885 (1934-35).

[13]The constitutional guarantees, of course, do not shield the publisher of a libel from responsibility to answer for his act in a criminal prosecution or civil action. This is just as true when the person defamed is a judge as it is in any other case. Near v. Minnesota (1931) 283 U.S. 697, 718, 719, 51 S. Ct. 625, 75 L. Ed. 1357.

administration of justice in the court. The lack of power in the courts to punish as contempts publications which are merely defamatory was pointed out in both the majority and dissenting opinions in the case. Thus Justice Black in the opinion of the court said, 314 U.S. at pages 270, 271, 62 S. Ct. at page 197, 86 L. Ed. 192:

"For these reasons we are convinced that the judgments below result in a curtailment of expression that cannot be dismissed as insignificant. If they can be justified at all, it must be in terms of some serious substantive evil which they are designed to avert. The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."

Likewise Justice Frankfurter in the dissenting opinion, in which Chief Justice Stone and Justices Roberts and Byrnes concurred, said, 314 U.S. at page 291, 62 S. Ct. at page 207, 86 L. Ed. 192:

"Comment however forthright is one thing. Intimidation with respect to specific matters still in judicial suspense, quite another. . . . A publication intended to teach the judge a lesson, or to vent spleen, or to discredit him, or to influence him in his future conduct, would not justify exercise of the contempt power. . . . It must refer to a matter under consideration and constitute in effect a threat to its impartial disposition."

■■ Turning again to Title IV, chapter 4, section 35-3, of the St. Croix Code (1921; 14 V.I.C. § 581 note), under which the defendant's publication was held to be a contempt, we observe that the publications which section 35-3 defines as criminal contempts are solely those which

are defamatory and tend to bring the court and judge into public disrepute and that the subsection does not purport to deal with publications which obstruct the administration of justice. It follows from what has been said that this provision of the St. Croix Code could not survive the introduction into the Virgin Islands, through section 34 of the Organic Act, of our constitutional guarantees of free speech and a free press but was repealed by section 18 of the Organic Act. The District Court, therefore, was without authority under the St. Croix Code as modified by the Organic Act to impose upon the defendant summary punishment for contempt by reason of the publication which is involved in this case:

The case of Francis v. People of Virgin Islands, 3 Cir., 1926, 1 V.I. 567, 11 F.2d 860, is not in conflict with this conclusion. That case was decided by this court prior to the passage of the Organic Act and, therefore, before the guarantees of free speech and a free press had been extended to the Virgin Islands. As we had occasion to point out in the Francis case the Virgin Islands had not been incorporated into the United States and the rights accorded by the Federal Constitution had therefore not been extended to the people of the islands. Compare Balzac v. Porto Rico (1922) 258 U.S. 298, 42 S. Ct. 343, 66 L. Ed. 627.

██ Finally, it should be pointed out that the action of the District Court cannot be supported upon the theory that the publication was in fact obstructive of its processes and therefore within its inherent power to punish as a contempt. For the Beatty trial, the judicial proceeding which the publication criticized, had been terminated by Beatty's acquittal five days before the article appeared and obviously could not have been obstructed by it.

The judgment of the District Court is reversed.