**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**MAXIMILIANO VELASQUEZ, III a/k/a "DADA"**
**JUAN GABRIEL VELASQUEZ a/k/a "GABBY"**
**JOSE MANUAL RIVERA a/k/a "P.D."**
**SHARIMA A. SEATON a/k/a "SHARIMA CLERCENT"**
**JOSE VENTURA, Defendants**

Case No. SX-2012-cr-063, Case No. SX-2012-cr-064, Case No. SX-2012-cr-065, Case No. SX-2012-cr-066, Case No. SX-2012-cr-076

Superior Court of the Virgin Islands

Division of St. Croix

January 16, 2014

KIPPY G. ROBERSON, ESQ., Assistant Attorney General, U.S. Virgin Islands Department of Justice, Christiansted, St. Croix, USVI, *Attorney for the People.*

GORDON C. RHEA, ESQ., Gordon C. Rhea, P.C., Mt. Pleasant, SC, *Attorney for Defendant Rivera.*

H. HANNIBAL O'BRYAN, ESQ., Office of the Territorial Public Defender, Kingshill, St. Croix, USVI, *Attorney for Defendant Velasquez III.*

VINCENT COLIANNI, II, ESQ., Colianni & Colianni, Christiansted, St. Croix, USVI, *Attorney for Defendant Velasquez.*

JOMO MEADE, ESQ., Frederiksted, St. Croix, USVI, *Attorney for Defendant Clercent.*

DANIEL L. CEVALLOS, ESQ., Cevallos & Wong LLP, Philadelphia, PA, *Attorney for Defendant Ventura.*

DONOHUE, *Judge*

## MEMORANDUM OPINION

(January 16, 2014)

■ These cases present the question of whether defendants charged with first-degree murder can ever be released on bail under section 3 of the Revised Organic Act of 1954 if the court previously determined that the proof is evident or the presumption great that the defendants committed the crime charged. Because this Court finds that section 3 was not intended to remove the trial court's discretion to grant bail if the prosecution delays bringing defendants charged with first-degree murder to trial, the Court will ·grant the motions for release of Defendants Maximiliano Velasquez, III, Juan Gabriel Velasquez, and Jose Ventura upon their posting sufficient sureties.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court detailed the factual allegations of the offenses allegedly committed by the Defendants in an August 1, 2012 Memorandum Opinion following a detention hearing. After presentation of the evidence, the Court ruled in favor of the People as to four of the five Defendants and ordered that Defendants Velasquez III, Velasquez, Rivera, and Ventura be detained pending trial. Because the Court concluded that the People had failed to carry their burden as to Defendant Clercent, the Court denied the People's motion to detain her and initially set bail at $1,500,000, which was later reduced to $500,000.

Following the detention hearing, the parties initiated discovery with the People filing a "Second Response to Discovery"[1] on May 3, 2012 in which they noted turning over five CD-ROMs of discoverable material to the Defendants' counsels and a third discovery notice filed on May 23, 2012 listing over a hundred items of discovery produced. According to the Court's files, however, nothing further occurred during the five months and four days between the detention hearing and the order detaining the Defendants prior to trial. Subsequent to the August 1, 2012 Memorandum Opinion, Clercent moved to reduce bail, which the People opposed, prompting a hearing on September 13, 2012 and a December 21, 2012 Order that granted her motion.

Aside from proceedings concerning Clercent's conditions of release, nothing further occurred in these matters after the August 1, 2012 Memorandum Opinion until the Court entered a January 9, 2013 Order *sua sponte* scheduling calendar call for May 24, 2013 and directing that all discovery be completed by April 8, 2013. In response, Ventura filed multiple pre-trial motions addressing outstanding discovery demands and requesting funds to hire expert witnesses and investigators. Ventura then moved for an extension of the discovery period on March 21, 2013, noting that the Court's April 8, 2013 discovery deadline would need to be extended if his recently-filed motions were granted. Ventura then filed two more motions — his sixteenth and seventeenth respectively subsequent to the January 9, 2013 Order — to dismiss based on the ten-year delay in filing charges and to dismiss based on insufficient evidence.

Rivera similarly responded the January 9, 2013 Order by moving for a date certain for trial and then moving to compel the People to respond to his discovery motion filed a year earlier and *in limine* to exclude certain trial testimony. Like Ventura, Rivera also moved to dismiss, claiming undue delay in filing charges which Clercent joined in a May 2, 2013 Notice.

The People also responded to the Court's scheduling order, first by filing a "Fourth Supplemental Discovery" notice on March 20, 2013 and then on April 10, 2013 — two days after the deadline for completing discovery had passed — by moving to extend discovery to July 15, 2013.

---

[1] Whether the People served a first response is unknown as the first discovery notice in the court's file is titled "second."

In support, the People proffered multiple reasons for needing more time including the volume of documents generated by multiple federal and local agencies involved in the ten-year investigation.[2] At the May 24, 2013 calendar call, the Court granted the People's and Defendant Ventura's motions to extend discovery and gave the People until July 31, 2013 to complete discovery. The Court also granted Rivera's motion for a trial date and set jury selection and trial for November 12, 2013, which was later memorialized in an August 19, 2013 Order.

Then, on July 17, 2013, the assistant attorney general initially assigned to these matters filed a motion to withdraw, explaining that his employment with the Virgin Islands Department of Justice would end that month and that he would no longer be able to appear in court as of July 13, 2013. The People did not advise the Court of who would appear as substitute counsel. Instead, on August 22, 2013 — four days after the August 19, 2013 Order was entered memorializing the November 12, 2013 jury selection and trial date — the People, through the Deputy Attorney General in his capacity as the supervisor of the Criminal Division for the District of St. Croix, filed a motion to continue trial,

---

[2] The explanation offered by the People in their Motion for the delay were as follows:

1) The above captioned case evolves from a 6 year investigation by [the] FBI, VIPD, and DEA of the activities of an alleged organized crime affiliation called the Commission.

2) The FBI, VIPD and DEA have generated separate files and investigations within their separate organizations and have turned thousands of pages of information over to the People.

3) The People have evaluated the voluminous documents and in order to protect the confidential sources used by the various agencies has found it necessary to redact all of the documents that are relevant to the case before the court.

4) The review of the review of the federal reports and documentation has also caused the People to request more complete and supplemental documentation including but not limited to transcripts of phone taps and backgrounds on confidential sources that have to [be] processed and released by the various agencies. At this time it is believed that much of the relevant discovery has not been released[.]

5) The People to date have release[d] thousands of documents that are relevant to this case and intend to continue to release information as it is processed.

6) Based on the volume, sensitivity and multiple sources of the discovery the People will require additional time to process and release the relevant discovery in this case.

(People's Mot. for Extension of Time to File Discovery 1-2, filed Apr. 10, 2013.)

explaining that the case agent and lead detective would be out of the Territory during November 2013. Clercent also moved for a continuance based on counsel's family-related travel plans. In a September 20, 2013 Order, the Court granted both motions but also expressed concern regarding the timing of those motions since the trial date was selected at the May 24, 2013 calendar call. The Court also noted that

> of concern is the July 17, 2013 Motion to Withdraw of [the] Assistant Attorney General . . . which is granted this date by separate Order. To date, no other counsel has entered an appearance for the People. These circumstance[s] are of substantial concern in light of the fact that four of the Defendants in these consolidated matters have been detained without bail for more than a year.

(Order 2-3, Sept. 20, 2013 (internal quotations omitted).) The Court re-scheduled jury selection and trial to January 21, 2014, extended the deadline for all dispositive motions to November 4, 2013, and scheduled a preliminary pre-trial conference for December 9, 2013 and a final pre-trial conference for January 9, 2014. The Court also ordered the People to have substitute counsel appear on or before October 4, 2013.

The Court later rescheduled the preliminary pre-trial conference to December 5, 2013, retaining all other deadlines in the September 20, 2013 Order including the January 21, 2014 jury selection and trial date. At the preliminary pre-trial conference, the Deputy Attorney General appeared on behalf of the People as no assistant attorney general had been assigned despite the Court's October 4, 2013 deadline. The Deputy Attorney General informed the Court that his office did not have a prosecutor available to assign due to staffing concerns and requested that the Court allow these matters to continue without an assigned prosecutor until March or April 2014 when the Department of Justice anticipated hiring a new prosecutor with the training and experience necessary for a multiple-defendant homicide case. Counsels for the Defendants strenuously objected, with Ventura's counsel remarking that trial should not be delayed to allow the prosecution time to "cherry-pick" a trial team. When asked by the Court how many attorneys were currently working in the prosecutor's office, the Deputy Attorney General answered seven, later revising that number to eight when the Court inquired whether he included himself in that number. The Court then construed the Deputy's

27

request as a motion to continue, denied it, and directed the People to assign a prosecutor on or before December 9, 2013.

Based on the representation of the Deputy Attorney General, counsels for Defendants Velasquez III, Velasquez, and Ventura orally moved the Court to release their clients on bail pending trial given the extensive delay. The present assistant attorney general filed his appearance on behalf of the People on December 9, 2013 as ordered and the Court then held three separate hearings on the motions for release. At the hearings on Ventura's motion and Velasquez's motion, the People first argued that the Court lacked the authority to release a defendant charged with first-degree murder when the Court already found that the People met their burden of proof for detention and then pointed out the scheduled trial date was only a few weeks away. Ventura objected to the People's observation, noting that trial had already been continued once and then challenged a justice system that viewed liberty so cavalierly as to deprive someone of their freedom because the delay would only take a few more weeks. Ventura also argued — but without reference to any binding or persuasive authority — that the delay in bringing a defendant to trial should constitute changed circumstances that would allow the Court to release a defendant.

Velasquez's release hearing proceeded similarly to Ventura's hearing with both the People and Velasquez's counsel arguing the same points. At Velasquez III's release hearing, however, the People no longer argued that the Superior Court lacks the authority to release a defendant previously ordered detained under section 3 of the Revised Organic Act, but instead argued that the Court should exercise its discretion against releasing Velasquez III's based on his criminal background and threats he allegedly made to a witness. Having taken all three motions for release under advisement, the Court now issues this ruling.

## DISCUSSION

■ Section 3 of the Revised Organic Act of 1954 provides that "[a]ll persons shall be bailable by sufficient sureties in the case of criminal offenses, except for first-degree murder or any capital offense when the proof is evident or the presumption great." Rev. Organic Act § 3, 48 U.S.C. § 1561, *reprinted in* V.I. Code Ann., Historical Documents, Organic Acts, and U.S. Const. at 86 (1995 ed.). Because section 3 does not address how courts must determine whether the proof is evident or the

28

presumption great, the Supreme Court of the Virgin Islands held in *Browne v. People*, 50 V.I. 241, 259-63 (2008), that the People of the Virgin Islands — like the majority of jurisdictions with similar provisions as section 3 — have the burden of proof and that that burden is greater than the probable cause standard but not as high as the "beyond a reasonable doubt" standard.

Shortly before *Browne* was decided, there was the local equivalent of a "circuit split" among the Superior Court judges regarding what authority governed bail in cases when a defendant was charged with first-degree murder. *See id.* at 244 ("In this appeal, this Court is asked to resolve a vital, recurring issue which has caused a split among the judges of the Superior Court of the Virgin Islands."). For example, in *People v. Dowdye*, 48 V.I. 45, 68 (V.I. Super. Ct. 2006), one Superior Court judge had concluded that the local pretrial detention statute, section 3504a of title 5 of the Virgin Islands Code, was preempted by section 3 of the Revised Organic Act whereas in *People v. Thomas*, 49 V.I. 151, 158 (V.I. Super. Ct. 2007), another judge determined that section 3504a had not been preempted but rather it was section 3 that was subsequently superseded by the Superior Court's rules, case law, and general practice. A third Superior Court judge held in *People v. Matthew*, 49 V.I. 285, 288 (V.I. Super. Ct. 2008), that the Bail Reform Act, 18 U.S.C. §§ 3141-56, applies through Superior Court Rule 141 and governs pre-trial bail determinations. The Virgin Islands Supreme Court resolved this conflict, explaining that because section 3 of the Revised Organic Act is a federal law, it preempts the local detention statute, rendering it "inapplicable to the extent that it purports to grant pretrial bail for defendants charged with first degree murder . . . where the proof is evident or the presumption great." *Browne*, 50 V.I. at 257-58. While *Browne*'s holding would seem to resolve the present motions for release — as the Court found in its August 1, 2012 Memorandum Opinion that proof was evident as to Defendants Velasquez III, Velasquez, Rivera, and Ventura — *Browne* is distinguishable for a number of reasons.

Notably, *Browne* did not address whether the Judiciary retained inherent or common law authority under section 3 to ever grant bail once detention was determined. Instead, the issue there was the split among the Superior Court judges regarding which statute, federal or local, governs pre-trial release. Since section 8(a) of the Revised Organic Act limits the Legislature's authority to "all rightful subjects of legislation not inconsistent with" the Revised Organic Act, *Browne* concluded that the

local pre-trial detention statute had to fall because it was inconsistent with section 3. Thus, *Browne* concerned only whether the Legislature possesses the authority to modify the right to bail provided in section 3. *Cf. Tobal v. People*, 51 V.I. 147, 152 (2009) (per curiam) (*"the Legislature* lacked the authority to provide in the local detention statute for pretrial release of defendants charged with first degree murder where the proof is evident and the presumption great." (emphasis added)). It did not address the question whether the court can ever grant bail in circumstances such as excessive delay in bringing that defendant to trial after a determination is made that the proof is evident and the presumption is great. Because this issue was not addressed in *Browne* or any subsequent case, this is a matter of first impression for the Court.

While *Browne* is binding on the Superior Court, decisions subsequent to *Browne* — regarding both section 3 and the common law generally — have called its holding somewhat into question. For example, in *Tobal v. People* the Supreme Court clarified that because *Browne*'s ultimate holding was "that the Legislature lacked the authority to provide in the local detention statute for pretrial release of defendants charged with first degree murder where the proof is evident and the presumption great," the Legislature also "violated the ROA by providing in the statute for pretrial detention without bail, in contravention of section 3's constitutional requirement that all defendants — other than those charged with first degree murder where the proof is evident or the presumption great — are bailable by sufficient sureties." 51 V.I. at 152, 160-61. The Court clarified that section 3 requires that "all defendants, other than those charged with first degree murder where the proof is evident or the presumption great, are bailable by sufficient sureties," and then struck down as inconsistent with the Revised Organic Act the sixty day pre-trial detention allowed by section 3504a of title 5. *Id.* at 153. Additionally, in *Williams v. People*, 53 V.I. 514, 525-26 (2010), the Court explained that "neither *Browne* nor *Tobal* held that section 3504a was abrogated in its entirety," and then concluded that section 3504a(b) "continues to govern the conduct of pre-trial detention hearings in the Superior Court." Thus, *Browne*, *Tobal*, and *Williams* each concern the Legislature's authority — not the inherent or common law authority of the Judiciary — regarding section 3's right to bail.

Other decisions of the Supreme Court have also eroded *Browne*'s ultimate holding. For example, in *Banks v. International Rental &*

30

*Leasing Corporation*, 55 V.I. 967, 979 (2011), the Supreme Court concluded that by creating a local court vested with the supreme judicial power of the Territory, the Legislature had superseded section 4 of title 1 of the Virgin Islands Code — authority which *Browne* was guided by in adopting the majority rule as to the burden and standard of proof for detaining a defendant under section 3 of the Revised Organic Act. *See Browne*, 50 V.I. at 259 (citing *Robles v. HOVENSA, L.L.C.*, 49 V.I. 491, 498-99 (2008) and noting parenthetically "that the Legislature intends the majority rule to govern in the absence of specific legislation"); *id.* at 263 ("again guided by title 1, section 4 of the Virgin Islands Code, we now adopt the majority position that the proof is evident or the presumption is great evidentiary standard requires something more than probable cause but less than beyond a reasonable doubt." (internal quotation marks omitted) (citing *Robles*, 49 V.I. at 498-99)). Additionally, the Court observed in *Matthew v. Herman*, 56 V.I. 674, 679-81 (2012), that *Banks* was the Court's "first substantive review of section 4 and how it interacts with the formation of common law in the Virgin Islands," and then clarified — albeit in the context of whether Virgin Islands courts must follow 1 V.I.C. § 4's directive to apply the American Law Institute's restatements of the law — that Virgin Islands courts should not "follow the majority blindly," but rather consider the majority rule and then determine whether it is "the soundest rule for the Virgin Islands." This approach of following the majority rule — when also the sounder rule for the Virgin Islands — was not employed in *Browne* in construing section 3. Although *Browne* did follow the majority approach in adopting the burden and standard of proof governing the court's determination, *Browne*'s ultimate holding — that "section 3 . . . *denies the right to pretrial bail* for defendants charged with first degree murder when the proof is evident or the presumption great," *Browne*, 50 V.I. at 257 (emphasis added) — would clearly place the Virgin Islands within the minority of jurisdictions if the People are correct as they initially argued that *Browne* means that defendants charged with first-degree murder can only be granted pre-trial bail if the People fail to carry their burden of proof.[3]

---

[3] One legal commentator has concluded that *Browne* does align the Virgin Islands with the minority jurisdictions, observing that

Further, if — as the People initially argued — *Browne* were read to mean that a defendant charged with first-degree murder must be held indefinitely pending trial so long as the proof is evident or the presumption great, that interpretation would further align the Virgin Islands with the minority rule, without having first determined whether it was the sounder rule, which would contradict the general principle "that the Virgin Islands Legislature intends majority rule to govern in the absence of specific legislation." *Matthew*, 56 V.I. at 680 (internal quotation marks, alterations, and citation omitted); *see also Farrell v. People*, 54 V.I. 600, 612-14 (2011). Because construing section 3 as mandating detention, without exception, would place the Virgin Islands within the minority of jurisdictions with similar bail provisions as section 3, this Court does not believe that construction is proper. *Cf. Todmann v. People*, 57 V.I. 540, 547 (2012) (per curiam) (finding no reason to interpret section 3 of the Revised Organic Act "any differently than the similar constitutional provisions" of the majority of states with similar bail provisions).

The right to bail in section 3 of the Revised Organic Act of 1954 — along with the other rights extended to the Territory in the Bill of Rights — originated in section 34 of the Organic Act of 1936.[4] *See, e.g.*, S. Rep.

---

[a]t the heart of the *Browne* case is the effect of the right-to-bail provision on legislative and judicial discretion to determine whether bail is ever appropriate in the cases excluded from its guarantee. Alabama, California, Florida, Maine, Mississippi, Nevada, North Dakota, Oklahoma, Rhode Island, South Dakota, and Vermont have read their constitutions to leave room for either the legislature or the court to determine whether to allow bail in the excepted cases. Arizona, Colorado, and Pennsylvania, on the other hand, join the Virgin Islands in holding that nearly identical provisions preclude this possibility, prohibiting bail for certain defendants when the proof is evident or the presumption great.

Ariana Lindermayer, *What the Right Hand Gives: Prohibitive Interpretations of the State Constitutional Right to Bail*, 78 FORDHAM L. REV. 267, 270 (2009).

[4] As initially drafted, the bail provision in Senate Bill No. 4524 provided that "[a]ll persons shall, before conviction, be bailable by sufficient sureties, except for first-degree murder or any capital offense." S. 4524, 74th Cong. § 34, *reprinted in* 80 Cong. Rec. 6607 (1936). During debate, an amendment was adopted, revising the language of the bail provision to how it is presently phrased. *See* 80 Cong. Rec. 6611 ("The Legislative Clerk: On page 54 it is proposed to strike out lines 8 to 11, inclusive, as follows: All persons shall, before conviction, be bailable by sufficient sureties, except for first-degree murder or any capital offense, when the proof is evident or the presumption great. And to insert in lieu thereof the following: All persons shall be bailable by sufficient sureties in the case of criminal offenses,

No. 83-1271 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2585, 2593 ("Section 3 provides a bill of rights which is in part similar to the Bill of Rights in the United States Constitution and which parallels the bill of rights, in somewhat different order, contained in the existing Virgin Islands Organic Act."); *see generally* Organic Act of 1936, § 34, 49 Stat. 1807, 1815, *repealed by* Act of Oct. 19, 1982, § 307, 96 Stat. 1705, 1700. In addressing the general purposes of the 1936 bill to adopt an organic act for the Virgin Islands, Senator William H. King of Utah explained to the United States Senate that section 34 "contains familiar provisions found in various organic acts and in State constitutions in relation to the Bill of Rights, providing for trial by jury, freedom of speech, and freedom of the press, that there shall be no unreasonable bail, and so forth." 80 Cong. Rec. 6609 (1936). This legislative history, while not extensive, sheds light on Congress's intent in adopting a Bill of Rights, including the right to bail, for the Virgin Islands. If provisions such as the right to bail as found in federal organic acts and State constitutions were familiar to Congress, then Congress must also be presumed to be similarly familiar with the interpretations and constructions given those provisions by the pertinent federal and state courts. *See, e.g., Ward v. People*, 58 V.I. 277, 283-84 (2013) ("Since the *Gavieres* and *Kepner* decisions were issued before Congress adopted the Revised Organic Act — and, in fact, pre-date the transfer of the Virgin Islands to the United States in 1917 — we may infer that Congress, by including this language in the Revised Organic Act and being aware of how that same language had been interpreted by the United States Supreme Court, intended to reach the same result with respect to the Virgin Islands."); *cf. People v. Brodhurst*, 148 F.2d 636, 643, 2 V.I. 448 (3d Cir. 1945) ("Section 34 of the Organic Act contains a comprehensive bill of rights for the inhabitants of the Virgin Islands. By the sentence just quoted the Organic Act guarantees to the inhabitants of the islands in the very language of the First Amendment to the Constitution of the United States the same freedom of speech and of the press which is safeguarded to the inhabitants of the United States by the First and Fourteenth Amendments. The construction which has been

---

except for first-degree murder or any capital offense when the proof is evident or the presumption great. The amendment to the amendment was agreed to."). No explanation or clarification was offered for the revision, however.

placed upon those amendments is, therefore, determinative as to the interpretation and effect of the language of the Organic Act.").

Eighty-five years before Congress granted the right to bail to persons living in the Virgin Islands, the Supreme Court of Alabama remarked, regarding the similar bail provision found in the Alabama Constitution, that its

> Bill of Rights was not designed to deny to the Legislature the power to pass laws providing for bail in capital cases, where the proof was evident or the presumption great. At the common law, all cases were bailable; but it was competent for the Legislature, in the absence of a constitutional inhibition, to deprive the citizen of this right, or so to modify as to render it valueless. The clause was designed not to place a perpetual restriction upon the common law right of the citizens of the State, in the matter of bail, but on the contrary to secure by the fundamental law of the State, and to place this right, in the given cases, beyond the power of either legislative or judicial interposition; creating, however, no restriction upon the Legislature as to the excepted cases, where the proof is evident or the presumption great. It was not the intention of the framers of the constitution to keep a party incarcerated in prison before conviction, as a punishment for the offence with which he may be charged. Until conviction, the law presumes him innocent, and merely provides for his being forthcoming for trial and to suffer its penalty, should his guilt be ascertained according to its prescribed forms. If, without any fault attributable to the accused, the judge from term to term, in the exercise of his discretion over the matter of continuances, should delay the case by reason of some want of preparation on the part of the State, it would seem strange that the same instrument which declares he shall be entitled to a speedy public trial, should provide that however long his trial may be delayed, no law shall be passed allowing him to find sureties for his appearance, and thus to discharge him from oppressive imprisonment.

*Ex parte Croom*, 19 Ala. 561, 570-71 (1851) (internal quotation marks omitted). The Supreme Court of Rhode Island similarly held more than a century later in *Fountaine v. Mullen*, 117 R.I. 262, 366 A.2d 1138 (1976) — a case which *Browne* cited with approval in adopting the majority rule for the standard of proof, *see* 50 V.I. at 262 — that the court retains discretion to grant

bail even if it finds the proof evident or the presumption great. The *Fountaine* court reasoned that Rhode Island's bail provision

> was intended to expand the bail rights enjoyed by defendants at common law. We believe it would be highly dubious to treat a provision that was enacted as a guarantee of rights in such a way as to retract rights previously enjoyed by defendants, absent clear evidence that the framers intended that result.

*Id.* at 1143-44 (internal quotation marks, citations, and ellipsis omitted).

██ This construction is the majority rule. That is, the majority of jurisdictions interpret their constitutional bail provisions to allow judges discretion to grant bail in the cases expressly excluded from the guarantee. *See, e.g., State v. Arthur*, 390 So. 2d 717, 718 (Fla. 1980) ("A larger number of jurisdictions have interpreted their constitutions to allow courts the discretion to grant release on bail even to those accused of capital crimes or crimes punishable by life imprisonment where the proof of guilt is evident or the presumption great."); *see also People v. Tinder*, 19 Cal. 539, 542 (1862); *Harnish v. State*, 531 A.2d 1264, 1269 (Me. 1987); *State v. Hartzell*, 13 N.D. 356, 100 N.W. 745, 746 (1904); *Ex parte Howell*, 34 Okla. Crim. 126, 245 P. 66, 66 (1926); *State v. Toomey*, 126 Vt. 123, 223 A.2d 473, 475 (1966); *see also* 8A AM. JUR. 2D BAIL & RECOGNIZANCE § 31 (2009) ("A provision that no right of bail is afforded to a defendant charged with a capital offense or an offense punishable by life imprisonment if the proof of guilt is evident and the presumption great does not necessarily deprive a trial court of the discretion to grant bail in such a situation, but those persons are not entitled to bail as a matter of right."); Lindermayer, *supra* note 3, at 290-301.

██ ██ Construing section 3 to allow Superior Court judges the discretion to grant bail would also accord with the general approach of the Supreme Court of the United States, that "language used in a statute which has a settled and well-known meaning, sanctioned by judicial decision, is presumed to be used in that sense by the legislative body." *Kepner v. United States*, 195 U.S. 100, 124, 24 S. Ct. 797, 49 L. Ed. 114 (1904). As the *Kepner* Court remarked in interpreting federal legislation providing a Bill of Rights for the Philippines while that country was under United States rule,

> [h]ow can it be successfully maintained that these expressions of fundamental rights, which have been the subject of frequent adjudication

in the courts of this country, and the maintenance of which has been ever deemed essential to our government, could be used by Congress in any other sense than that which has been placed upon them in construing the instrument from which they were taken? . . .

*Id.* The Court then explained that "[i]n ascertaining the meaning of the phrase taken from the Bill of Rights it must be construed with reference to the common law from which it is taken." *Id.* at 125. Although the right at issue in *Kepner* was the right not to be twice put in jeopardy, the U.S. Supreme Court's command to look to the common law generally when construing fundamental rights granted by Congress to United States Territories nonetheless remains controlling. *Cf. Ward*, 58 V.I. at 283-84.

Another consideration that was not expressly presented to the *Browne* Court is that the offense of first-degree murder may be, in fact, bailable at present because it is no longer a capital offense. That is, Congress may have — by including the offense of first-degree murder within the phrase "except for first-degree murder or any capital offense" — intended that first-degree murder be one example of the class of capital offenses not guaranteed the right to bail. Prior to either organic act being adopted, the Colonial Councils — the local legislative bodies operating under the Danish crown which continued under the administration of United States Navy — decided in 1920 that a code of laws should be compiled for each municipality within the newly-acquired United States Territory: one for the Municipality of St. Thomas and St. John and another for the Municipality of St. Croix. *See, e.g., Paiewonsky v. Paiewonsky*, 315 F. Supp. 752, 754, 8 V.I. 52 (D.V.I. 1970) ("The first codification of the laws of the Virgin Islands subsequent to the transfer of this [T]erritory from the Kingdom of Denmark to the United States of America was the 1921 code."). Among the offenses criminalized in the 1921 Codes was murder, which was divided into two degrees with murder in the first degree defined as

> [a]ll murder which is perpetrated by means of poison lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, burglary, robbery, or mayhem . . . .

St. Thomas/St. John Mun. Code of Laws tit. IV, ch. 5 § 2 (1921); St. Croix Mun. Code of Laws tit. IV, ch. 5 § 2 (1921) (hereinafter "1921 Codes"),

*microformed on* Codes, Ordinance, Laws, and Resolutions of the Virgin Islands: 1917-1954, call no. LL-0301 (Library of Congress), *repealed by* V.I. CODE ANN. tit. 1 § 5 (1957 ed.). The punishment for first-degree murder was death — unless the court found extenuating circumstances which then reduced the punishment to imprisonment for life. *See id.* § 3 ("Every person guilty of murder in the first degree shall suffer death, or if there be extenuating circumstances, shall suffer confinement in the penitentiary for life. Upon a plea of guilty the court shall determine the punishment. Upon a verdict of guilty the jury in the verdict shall recommend whether the punishment be death or imprisonment."). First-degree murder remained a capital offense in the Virgin Islands until 1957 when the Legislature — in addition to repealing the 1921 Codes and adopting in their place a comprehensive code to govern the entire Territory, *see* 1 V.I.C. § 5(2) — abolished the death penalty. *See* Act No. 160, § 88, 1957 V.I. Sess. Laws 20, 56 (May 16, 1957). Therefore, when the Organic Act was adopted in 1936, and even when it was later revised in 1954, first-degree murder was a capital offense in the Virgin Islands. Presently, however, there are no capital offenses under local law in this jurisdiction.

To reach the conclusion that first-degree murder requires the denial of bail, one must first assume that Congress intended first-degree murder to stand separately as a basis for denying bail. In other words, the Court must conclude that Congress intended both first-degree murder as well as any capital offense be excluded from the right to bail, rather than including first-degree murder as an example of the category of offenses punished capitally for which bail was not guaranteed. The Virgin Islands appears to be unique in that within our bail provision, Congress included both a specific offense, first-degree murder, and a general phrase referring to punishment or penalty, any capital offense. Those jurisdictions that have not modernized their bail provisions to enumerate specific offenses for which bail may be denied retain general language regarding the possible punishment. *See, e.g.*, FLA. CONST. art. I, § 14 ("Unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great, every person charged with a crime or violation of municipal or county ordinance shall be entitled to pretrial release on reasonable conditions."); KY. CONST. § 16 ("All prisoners shall be bailable by sufficient securities, unless for capital offenses when the proof is evident or the presumption great."); MT. CONST. art. II, § 21 ("All persons shall be bailable by sufficient sureties,

except for capital offenses, when the proof is evident or the presumption great"); N.J. CONST. art. I, ¶ 11 ("All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or presumption great."). States with this general language have construed the "except for" language in their constitutions as referring to the penalty a defendant faces, rather than the type of offense that may be charged. *See, e.g., Commonwealth v. Truesdale*, 449 Pa. 325, 296 A.2d 829, 832 (1972) ("capital offense refers to the punishment or penalty which may be imposed upon the person found guilty of a crime, rather than a definition of a particular crime."); *State v. Pett*, 253 Minn. 429, 92 N.W.2d 205, 206-09 (1958) (discussing cases construing excepted language as referring to the punishment, not the offense). This construction is persuasive because courts have long recognized that it is the possible punishment, not the offense charged, for which bail may be denied. As the New Jersey Appellate Division explained, "[t]he purpose is, of course, to deny bail where the prisoner's assumed apprehension of being put to death if found guilty creates the hazard that he will forfeit the bail rather than forfeit his life. Where there is no such hazard bail attends even capital cases." *In re Application of Corbo*, 54 N.J. Super. 575, 149 A.2d 828, 834 (N.J. App. Div. 1959).

 Thus, by including first-degree murder within the phrase "except for first-degree murder or any capital offense" Congress either intended that first-degree murder and any capital offense stood independently under our bail provision, or Congress intended the phrase "except for first-degree murder or any capital offense" as written, that is that first-degree murder was one of any other offenses the Legislature might establish as punishable by death. If Congress intended to exclude first-degree murder from the bail guarantee — regardless of the punishment the Legislature may affix — Congress could have used "and" rather than "or." That is, Congress could have drafted the exclusionary clause to read "except for first-degree murder and any capital offense." It did not and since federal statutes like section 3 "ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant," *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001) (internal quotation marks and citation omitted), a better reading would be to construe Congress's inclusion of first-degree murder as an example of the category of capital offenses for which the right to bail could be denied,

38

particularly as the opposite reading would have rendered — at least prior to the abolishment of the death penalty — section 3's exclusionary language superfluous since "any capital offense" necessarily included "first-degree murder."

■ Accordingly, because concluding that a defendant detained under section 3 can never be bailable pending trial would be contrary to our Supreme Court's jurisprudence regarding following the majority rule in determining the common law, *see Duggins v. People*, 56 V.I. 295, 302-03 (2012), this Court believes that the soundest rule — while still adhering to *Browne's* ultimate holding — is to give section 3 the interpretation of the majority of jurisdictions and construe it to allow courts discretion to grant bail to a defendant charged with first-degree murder when as here the People engage in excessive delay in bringing that defendant to trial. To hold otherwise would allow the rights of the accused to be trampled by a lack of process. Simply put, Section 3 of the Revised Organic Act guarantees bail to all defendants except those charged with first-degree murder or any other offense punishable by death, but it does not prohibit the granting of bail under the appropriate conditions.

■ Here, the circumstances since the Defendants' arrest have changed, justifying their release. *Cf. Tinder*, 19 Cal. at 549 ("circumstances frequently arise which will justify the allowance of bail after indictment found. Thus bail may be allowed if the trial of the prisoner has been unreasonably delayed. And under our statute, if the trial be postponed, even upon sufficient reasons, from term to term, the Court may discharge the defendant on his own recognizance or on bail."). The Defendants were arrested and charged with first-degree murder in February 2012. By February 2013 — a year later — the only movement toward trial had been two, possibly three, discovery productions by the People. Even with such minimal activity, the People contended, in their April 10, 2013 Motion for Extension of Time to File Discovery, that "much of the relevant discovery has not been released." (People's Mot. for Extension of Time to File Discovery at 2.) At the May 24, 2013 hearing, the People were granted until July 31, 2013 to complete discovery yet that deadline came and went with the withdrawal of the assigned prosecutor. Five more months passed before the People assigned another assistant attorney general to this case and if not for the Court prompting the People to act, these matters would have remained without an assigned prosecutor for possibly another three to four months or until an assistant attorney general was hired. This would

have meant that the prosecution of this allegedly heinous crime would have gone dormant for nearly a year.[5] Most importantly, that would have also meant that the Defendants would have been forced to remain incarcerated — without having been found guilty — for more than three years since being arrested, and potentially longer should the newly-hired assistant attorney general have needed time to prepare. Given that these matters were being investigated for over a decade, and that there is no statute of limitations for first-degree murder, the People could have had its case ready for trial long before it brought charges against the Defendants, rather than force them to remain incarcerated while the People review, redact, and produce its documents and secure its witnesses. While the delay does not rise to the level of a violation of the constitutional right to a speedy trial warranting dismissal of the charges for failure to prosecute, that also does not mean that the Defendants must remain incarcerated waiting until it does. Instead, they are entitled to be released on bail within the discretion of the court. *Cf. Marzilli v. Howard*, 108 R.I. 309, 274 A.2d 902, 903-04 (1971).

### CONCLUSION

For the reasons stated above, the Court concludes that, notwithstanding the Virgin Islands Supreme Court's decision in *Browne*, defendants charged with first-degree murder may be released on bail pending trial under section 3 or the Revised Organic Act. Therefore, the motions for release of Defendants Velasquez III, Velasquez, and Ventura will be granted upon the setting of appropriate conditions specific to each Defendant.

---

[5] Such conduct clearly fails to come close to the standards promulgated by the American Bar Association to guide prosecutors in exercising their duties. For example, Standard 3-2.9(a) directs that the "prosecutor should avoid unnecessary delay in the disposition of cases," and "should not fail to act with reasonable diligence and promptness in prosecuting an accused." Standard 3-2.9(e) similarly directs that the

> prosecutor, without attempting to get more funding for additional staff, should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality representation, endangers the interests of justice in the speedy disposition of charges, or may lead to the breach of professional obligations.

ABA Standards for Criminal Justice: Prosecution and Defense Function, Standard 3.2.9 (e) (3d ed. 1993).